1
2
3
4                    UNITED STATES DISTRICT COURT
5            FOR THE NORTHERN DISTRICT OF CALIFORNIA
6                         OAKLAND DIVISION
7

8  | CARL ZEISS MEDITEC, INC.,                    | Case No:  19-4162 SBA |

9  Plaintiff,                           **ORDER GRANTING PLAINTIFF'S
                                          RENEWED MOTION FOR
10  vs.                                   PRELIMINARY INJUNCTION**

11  TOPCON MEDICAL SYSTEMS, INC.,         REDACTED
    TOPCON HEALTHCARE SOLUTIONS,
12  INC., TOBIAS KURKZE, GREG             Dkt. 131, 277, 286
    HOFFMEYER, GENEVIEVE FAY,
13  KATALIN SPENCER, KEITH BROCK,
    CHARLES GUIBORD, JR., JOSEPH
14  CICCANESI, AND MICHAEL CHEN,

15  Defendants.

16

17         Plaintiff Carl Zeiss Meditech, Inc. ("CZMI") accuses Defendants Topcon Medical

18  Systems, Inc. ("TMS"), and Topcon Healthcare Solutions, Inc. ("THS") (collectively

19  "Topcon," unless otherwise noted), along with Tobias Kurzke ("Kurzke") and seven other

20  former CZMI employees (collectively "Former Employees")[1] of misappropriating its trade

21  secrets.  The Third Amended Complaint ("TAC"), the operative pleading, alleges violations

22  of the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and the

23  California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq., and

24  related claims.

25

26

27         [1] The other Former Employees are:  Greg Hoffmeyer ("Hoffmeyer"); Genevieve Fay
    ("Fay"); Katalin Spencer ("Spencer"); Keith Brock ("Brock"); Charles Guibord, Jr.
28  ("Guibord"); Joseph Ciccanesi ("Ciccanesi"); and Dr. Michael Chen ("Chen")

The parties are presently before the Court on CZMI's Renewed Motion for Preliminary Injunction.  Dkt. 131, 130-4.  CZMI seeks, inter alia, to enjoin Topcon from releasing a product called Glaucoma Module and to prevent Defendants from disclosing CZMI's trade secrets to Topcon or any other entity.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS CZMI's motion.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

I. **BACKGROUND**

A. FACTUAL SUMMARY

1. **CZMI**

The parties are familiar with the facts of this case, which are summarized briefly herein to the extent they bear upon the instant motion.  CZMI, a subsidiary of non-party Carl Zeiss Meditec AG ("Zeiss"), is a market leader in the ophthalmic diagnostics ("ODx") industry.  See TAC ¶ 33, Dkt. 127, 126-3; Supp. Elman Decl. Exs. 14, 28-29, 33, 37, Dkt. 267-6, 271.  Among CZMI's ODx software products is FORUM, a sophisticated data management system designed for ophthalmology practices.  See id. ¶ 41; Elman Decl. Ex. 7, Dkt. 127-9.  Forum has been on the market since 2009.  Id.

Four years after launching FORUM, CZMI released a companion software product called Glaucoma Workplace, which operates on the FORUM platform.  See Elman Decl. Ex. 9, 10, Dkt. 127-11, 127-12.  Glaucoma Workplace is designed to diagnose and manage eye diseases, such as glaucoma, and works with ophthalmic devices, such as CZMI's Humphrey Field Analyzer ("HFA") and Cirrus OCT (Optical Coherence Tomography).  See id.; Supp. Elman Decl. Ex. 33 (Patella Depo. at 73:24-76:5), Dkt. 271-7.  An HFA is a device that performs a visual field analysis on a patient (i.e., peripheral vision) to diagnose potential eye conditions, such as glaucoma.  Supp. Kurzke Decl. ¶ 8, Dkt. 279-3; TAC ¶ 73.  The Cirrus OCT also is used to diagnose eye conditions by performing sophisticated OCT scans of the retina.  See Elman Decl. Ex. 3 (Kurzke Depo. at 54:8-14), Dkt. 126-9.  Glaucoma Workplace offers a unique software solution in that it combines OCT data and

visual field data from the HFA and presents the information in a visual way that helps practitioners formulate a glaucoma diagnosis.  See id. (Kurzke Depo. 54:2-21.277:10-14); Supp. Elman Decl. Ex. 33 (Patella Depo. at 75:11-76:5).

Defendant Kurzke worked at CZMI and Zeiss over the course of approximately thirteen years.  He started with Zeiss in January 2006, and later joined CZMI in 2015.  See Supp. Kurzke Decl. ¶ 3.  At CZMI, he served as a Senior Product Manager from August 2015 until April 2018.  See id.  In that capacity, Kurzke oversaw Glaucoma Workplace and another product, Retina Workplace.  See Geller Decl. Ex. A (Kurzke Depo. at 62:2-26), Dkt. 142-5.  He also worked with the product teams in charge of Cirrus OCT and the HFA.  See Elman Decl. Ex. 3 (Kurzke Depo. at 46:13-23)  In January 2016, Kurzke transferred his responsibilities for Glaucoma Workplace to Claudia Wasch.  See id.

Kurzke's employment with CZMI was governed by a Trade Secret and Confidential Protection Information Agreement ("Trade Secret Agreement").  See id. Ex. 12 ¶ 4 (copy of Trade Secret Agreement executed by Kurzke on March 19, 2015), Dkt. 126-13.  This agreement forbade him from using or disclosing any company confidential information belonging to CZMI while employed and after his separation.  See id.  In addition, Kurzke agreed "that immediately upon termination of employment … [he] shall return to Company all Company property … in all formats … including all Confidential Information [and] … external storage devices…." Id. ¶ 7.  Finally, he acknowledged in the agreement that CZMI has "the right to injunctive relief to restrain and enjoin any actual or threatened breach of the provisions of [the Trade Secret Agreement]." Id. ¶ 9.[2]

## 2.   Topcon

In or about 2017, Topcon Corporation incorporated a new subsidiary, THS, to create software solutions "for the eye-care industry and as the software and tele-ophthalmology

---

[2] The Trade Secret Agreement expressly applies to employment with Zeiss and any of its subsidiaries or affiliates, including CZMI.  Id.

arm of Topcon Corporation."[3]  See Nelson Decl. ¶ 5, Dkt. 5.  According to CZMI, in 2018, Topcon, with assistance from two former CZMI employees now at Topcon, began recruiting CZMI employees to help Topcon develop ODx products to compete with CZMI.  See TAC ¶ 63.  Topcon allegedly focused on recruiting CZMI's employees with diverse work experience and who had knowledge of the company's trade secrets and confidential information pertaining to CZMI's ODx products.  See id.  Topcon denies having engaged in any such targeted recruitment effort.  See Topcon Opp'n at 9, Dkt. 142-8.

Kurzke was the first of the Former Employees to leave CZMI for THS.  He resigned from CZMI on April 27, 2018, and began working for THS on April 30, 2018.  TAC ¶ 139; Elman Decl. Ex. 3 (Kurzke Depo. at 181:1-5, 90:14-16).  After Kurzke joined Topcon, the other Former Employees (Hoffmeyer, Fay, Spencer, Ciccanesi, Guibord, Brock and Chen) followed suit.  See TAC ¶¶ 114, 139, 140, 152.

In the beginning of 2019, THS launched a software platform called Harmony, which was intended to compete with FORUM.  See Elman Decl. Ex. 3 (Kurzke Depo. at 202:21-203:1).  Since 2017, Topcon has been developing Glaucoma Module (as an add-on to Harmony) to compete directly with Glaucoma Workplace.  See Geller Decl. Ex. A (Kurzke Depo. at 214:5-16; 215:4-10); Trefethen Decl. ¶ 8, Dkt. 143-8.  Topcon has already launched Glaucoma Module in Latin America and currently is seeking preliminary approval to sell Glaucoma Module in the United States.  See Supp. Elman Decl. Ex. 12 (Schmid Depo at 105:19-108:5); Ex. 13; Ex. 14; Ex. 15. Ex. 16 (Ferro Depo. at 126:3-9), Dkt. 271-2–271-5.

CZMI alleges it has spent over a decade and millions of dollars in developing its ODx products, including FORUM and Glaucoma Workplace.  See Pl.'s Revised Reply at 13 (citing TAC ¶¶ 33-40 & Elman Decl. Exs. 5, 6), Dkt. 270.  According to CZMI, Topcon has been able to develop Glaucoma Module in a much shorter window of time due to the unfair advantage it gained by exploiting CZMI's trade secrets provided by Kurzke and

---

[3] Topcon Corporation was previously named as a party in this action but was dismissed upon stipulation by the parties.  Dkt. 183.

other Former Employees.  See id.  The centerpiece of CZMI's claims, and the foundation of the instant motion for preliminary injunction, is Kurzke's admitted retention of an external hard drive ("Hard Drive") containing over 35,000 confidential, proprietary and trade secret information files belonging to CZMI.  See Pl.'s Renewed Mot. at 1, Dkt. 130-4.  CZMI further alleges that other of the Former Employees downloaded CZMI confidential business, marketing and pricing information relating to Glaucoma Workplace before onboarding with Topcon.  See id. at 6.

### 3.    Alleged Misappropriation of Trade Secrets

On April 14, 2018, after accepting Topcon's job offer but before resigning from CZMI, Kurzke copied a number of files on the Hard Drive that he used to back-up his company laptop.  See Elman Decl. Ex. 2 (listing of files stored on the Hard Drive), Dkt. 127-4; Kurzke Decl. ¶ 13, Dkt. 143-4; TAC ¶ 7.  The Hard Drive contains over 35,000 files that CZMI considers confidential, along with a cloned copy of Kurzke's CZMI workstation.  See Elman Decl. Ex. 2   Upon leaving CZMI, Kurzke relinquished his laptop to CZMI; however, he did not turn in the Hard Drive or notify CZMI of its existence.  See Elman Decl. Ex. 3 (Kurzke Depo. at 93:7-14, 97:2-13); Burton Decl. ¶ 9, Dkt. 148-6.

CZMI contends that after joining Topcon, Kurzke accessed numerous files stored on the Hard Drive containing CZMI trade secrets, including DICOM files containing HFA data and sensitive financial data, business plans and customer information.  See Pl.'s Revised Reply at 7-12; Elman Decl. Ex. 2; see also Supp. Elman Decl. Ex. 2 (D'Souza Depo. at 113:13-14).  DICOM is a "vendor neutral standard" to exchange medical images and information across vendors and systems.  See Elman Decl. Ex. 3 (Kurzke Depo. at 41:14-16).  CZMI contends that, while working for Topcon, Kurzke accessed DICOM files

from his Hard Drive, including a collection of data files and reports generated by the HFA.[4]
See id. Exs. 21, 22.  CZMI claims that the specific set of HFA reports stored on the Hard
Drive is confidential and used specifically to test CZMI products.  See Pl.'s Revised Reply
at 7-9.  While employed by Topcon, Kurzke, in his capacity as Topcon's Director of
Product Management, shared those data files with others at Topcon and with third party
software developer Calcey Technologies LLC ("Calcey").  See Supp. Elman Decl. Exs. 21-
22 (HFA data files sent to Calcey).  On behalf of Topcon, Calcey used those files to
develop and test SuperNorm, a "crucial" feature of Glaucoma Module.  See id. Ex. 23.

---

[4] As noted, an HFA is a diagnostic device sold by CZMI that evaluates a patient's
peripheral vision.  After a patient completes a session with an HFA, the device creates and
transmits a data set of information to FORUM.  See Supp. Elman Decl. Ex. 29 (D'Souza
Depo. at 205:10-23), Dkt. 268-7.  When FORUM receives the data, the software begins a
background process to create a report that can then be accessed through CZMI's Glaucoma
Workplace.  See id. at 205:7-208:20.  The clinician can use Glaucoma Workplace to
generate a report containing the results of the patient's visual field examination in a number
of formats, including a PDF file which can be printed.  See id.; Isola Decl. Ex. C (Wasch
Depo. at 123:18-124:15). Dkt. 277-10.

Module.  See id. Exs. 18 (Response to Interrog. No. 2), 19 (Resp. to RFA No. 12, Supp. Responses to RFA Nos. 5, 6, 7, 22).[5]

## B.   PROCEDURAL HISTORY

On July 19, 2019, CZMI filed suit in this Court against Topcon and the Former Employees for trade secret misappropriation under federal and state law and related claims. CZMI filed a motion for preliminary injunction and Defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  See Dkt. 9, 37, 49.  The Court granted the motion to dismiss with leave to amend and denied the motion for preliminary injunction as moot, in light of said ruling.  See Dkt. 75.

CZMI filed a TAC on January 31, 2020.  The causes of action alleged therein consist of: (1) misappropriation under DTSA; (2) aiding and abetting misappropriation under DTSA; (3) misappropriation under the CUTSA; (4) breach of contract; (5) patent infringement (as to Topcon only); and (6) tortious interference.  See Dkt. 195, 193-4.  On motion of Topcon, the Court dismissed the patent infringement claim.  See Dkt. 285.

CZMI has now renewed its request for an injunction against Topcon and Kurzke, individually.  See Pl.'s Renewed Mot., Dkt 130-4 at 2.  As relief, the motion seeks an order: (1) directing all Defendants to immediately cease and desist disclosure of CZMI Trade Secrets to Topcon or any other third party; (2) enjoining all Defendants from using any CZMI Trade Secrets and CZMI confidential information that is uncovered through an ongoing forensic examination; and (3) enjoining Topcon from releasing Glaucoma Module and any other ODx product using CZMI trade secrets in the United States.  See id.[6]

---

[5] Defendants do not dispute the foregoing, but, citing Kurzke's supplemental declaration filed in support of their surreply, contend that Brock, Guibord and Ciccanesi do not work on Glaucoma Module.  See Defs.' Surreply at 6-7 (citing Suppl. Kurzke Decl. ¶ 9).  However, Kurzke merely stated that he was informed and believes that these individuals "do not work, and have not worked, on Glaucoma Module," but does not state the basis for such information and belief.  See Suppl. Kurzke Decl. ¶ 9.

[6] In its Revised Reply, CZMI now limits the proposed injunction to Glaucoma Module specifically.

1    Topcon and Former Employees filed oppositions to CZMI's renewed motion, which

2   argue, inter alia, that CZMI had failed to adequately identify the trade secrets that had

3   allegedly been misappropriated.  CZMI filed a single reply, which provides more specific

4   detail regarding the trade secrets underlying the renewed motion.  In response, Defendants

5   complained that CZMI's reply presented new arguments and new matter, and therefore,

6   they should be permitted to file a surreply.  The Court thus directed CZMI to file a revised,

7   superseding reply (including supporting exhibits), focusing on the actual issues in dispute.

8   Dkt. 266.  The Court also permitted Defendants to file a joint surreply in response to the

9   revised reply.[7]  Dkt. 266, 270, 279.  The parties have timely filed the briefs, as directed by

10  the Court.  Defendants have also filed objections to certain of the exhibits presented by

11  CZMI with its revised reply.  Dkt. 278.[8]

12  ## II.   LEGAL STANDARD

13  "A plaintiff seeking a preliminary injunction must establish that he is likely to

14  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

15  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

16  the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th

17  Cir. 2011) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). "The

18  first factor under Winter is the most important -- likely success on the merits."  Garcia v.

19  Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015).

20

21  _____

22      [7] In its revised reply, CZMI purportedly seeks an injunction against other Former
    Employees, despite only providing notice to Topcon and Defendant Kurzke in its Notice of
23  its renewed motion.  Compare Pl.'s Revised Reply at 1, Dkt. 267-4 with Pl.'s Renewed
    Mot. at 1, Dkt. 131.  Since CZMI has failed to provide proper notice to other Former
24  Employees as required, the Court does not consider the requested injunction to be directed
    against any of the Former Employees other than Kurzke.  See United States v. Microsoft
25  Corp., 147 F.3d 935, 944 (D.C. Cir. 1998) ("The purpose of Rule 65(a)(1)'s notice
    requirement is to allow the opposing party a fair opportunity to oppose the preliminary
26  injunction and compliance is mandatory.")

27      [8] Though this should be obvious, the Court reminds the parties, and CZMI in
    particular, that citations to the record should be as specific as possible.  The failure to
28  provide the requisite pinpoint citations delays resolution of the matter presented to the
    Court.

Alternatively, a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor," if the plaintiff "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Cottrell, 632 F.3d at 1135. This reflects the Ninth Circuit's "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Id. at 1131. In all cases, at an "irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." Pimentel v. Dreyfus, 670 F.3d 1096, 1105-106 (9th Cir. 2012) (internal quotation and citation omitted).

## III.   **DISCUSSION**

### A.   EVIDENTIARY MATTERS

Defendants object to certain of the exhibits attached to the Supplemental Declaration of Jeremy Elman filed by CZMI in support of its renewed reply. See Defs.' Jt. Objections at 1, Dkt. 278. Specifically, Defendants object to Exhibits 3, 4, 5, 6, 7, 8, 10, 13, 14, 17, 21, 22, 25 and 26 for lack of foundation, see Fed. R. Evid. 602, and hearsay, see id. 802. These objections are both procedurally and substantively flawed.

Defendants' objections do not comply with the local rules. As a general matter, any evidentiary objections must be set forth "within the reply brief or memorandum." Civ. L.R. 7-3(c).[9] Here, Defendants improperly accompanied their surreply with a separate brief setting forth numerous evidentiary objections. In view of Defendants' failure to comply with the Local Rules, the Court overrules the objections. Tri-Valley CARES v. U.S. Dept. of Energy, 671 F.3d 1113, 1131 (9th Cir. 2012) ("Denial of a motion as the result of a failure to comply with local rules is well within a district court's discretion."); Christian v.

---

[9] Pursuant to Rule 7-3(d)(1), a party may file a separate Objection to Reply Evidence, but that filing is not to exceed five pages. However, the rule permitting a separate objection does apply where, as here, the Court has permitted a party to file a brief in response to the reply. In any event, Defendants' objection is seven pages, exceeding the aforementioned five-page limit.

1  Mattel, Inc., 286 F.3d 1118, 1129 (9th Cir. 2002) ("The district court has considerable

2  latitude in managing the parties' motion practice and enforcing local rules that place

3  parameters on briefing.").

4  The above notwithstanding, Defendants' objections are not well taken.  As this

5  Court has previously explained, "the Federal Rules of Evidence do not strictly apply to

6  preliminary injunction proceedings." Stardock Sys., Inc. v. Reiche, No. C 17-07025 SBA,

7  2018 WL 7348858, at *6 (N.D. Cal. Dec. 27, 2018) (internal quotations and citations

8  omitted).  The reason for the relaxed evidentiary rules is that the procedures relevant to

9  seeking a preliminary injunction "are less formal" and the evidence is "less complete than

10  in a trial on the merits." Univ. of Texas v. Camenish, 451 U.S. 390, 395 (1981).  As a

11  result, the Court has the discretion to consider otherwise inadmissible or hearsay evidence

12  in connection with a motion for preliminary injunction.  See Flynt Distrib. Co. v. Harvey,

13  734 F.2d 1389, 1394 (9th Cir. 1984) (holding that district courts "may give even

14  inadmissible evidence some weight" when deciding whether to issue a preliminary

15  injunction); Republic of the Philippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988) (en

16  banc) ("It was within the discretion of the district court to accept this hearsay for purposes

17  of deciding whether to issue the preliminary injunction.").  To the extent there are any

18  evidentiary flaws in the challenged exhibits, such issues "properly go to weight rather than

19  admissibility." Stardock Sys., 2018 WL 7348858, at *6.  Defendants' objections are

20  therefore overruled.

21  **B.   LIKELIHOOD OF SUCCESS ON THE MERITS**

22  **1.   Misappropriation of Trade Secrets**

23  The elements of a claim for misappropriation of trade secrets under DTSA and

24  CUTSA are: (1) the plaintiff owned a trade secret; (2) the defendant acquired, disclosed, or

25  used the plaintiff's trade secret through improper means; and (3) the defendant's actions

26  damaged the plaintiff. Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1665

27  (2003) (setting forth the elements under CUTSA); Alta Devices, Inc. v. LG Elecs., Inc., 343

28

1   F. Supp. 3d 868, 877 (N.D. Cal. 2018) (stating that the elements under DTSA and CUTSA

2   are essentially the same).

3       A "trade secret" is defined as "information, including a formula, pattern,

4   compilation, program, device, method, technique or process," that (a) "[d]erives

5   independent economic value, actual or potential, from not being generally known to the

6   public or to other persons who can obtain economic value from its discourse or use" and

7   (b) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its

8   secrecy." Cal. Civ. Code § 3426.1(d); see also 18 U.S.C. § 1839(3) (defining "trade secret"

9   as "financial, business, scientific, technical, economic, or engineering information,

10  including patterns, plans, compilations, program devices, formulas, designs, prototypes,

11  methods, techniques, processes, procedures, programs, or codes….").

12       Under DTSA and CUTSA, "misappropriation" is defined as either (1) the

13  "*[a]cquisition* of a trade secret by another person who knows or has reason to know that the

14  trade secret was acquired by improper means," or (2) the "*[d]isclosure or use* of a trade

15  secret of another without express or implied consent."  18 U.S.C. § 1839(5) (emphasis

16  added); Cal. Civ. Code § 3426.1(b).  E.g., Robillard v. Opal Labs, Inc., 428 F. Supp. 3d

17  412, 451-52 (D. Or. 2019) ("The DTSA 'contemplates three theories of liability:

18  (1) acquisition, (2) disclosure, or (3) use.'") (citations omitted).

19       "Because direct evidence of misappropriation and misuse is not always available,

20  plaintiffs can rely on circumstantial evidence to prove their case."  M.A. Mobile Ltd. v.

21  Indian Inst. of Tech. Kharagpur, 400 F. Supp. 3d 867, 893 (N.D. Cal. 2019).  "In most

22  cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from

23  which the trier of fact may draw inferences which convince him that it is more probable

24  than not that what plaintiffs allege happened did in fact take place."  UniRAM Tech., Inc.

25  v. Taiwan Semiconductor Mfg. Co., 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007).

26       As will be explained below, CZMI has shown a likelihood of success on, or

27  alternatively, serious questions going to the merits of its DTSA and CUTSA claims based

28  on either "acquisition" or "disclosure or use" theories of misappropriation.

*a)*      *Acquisition*

As discussed, a defendant misappropriates trade secrets by acquisition if it "knows or has reason to know that the trade secret was acquired by improper means."  1839(5)(A); Cal. Civ. Code §§ 3426.1(a) & (b)(1).  The phrase "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means …." 18 U.S.C. § 1839(6)(A); Cal. Civ. Code § 3426.1(a).

Under the terms of his Trade Secret Agreement, Kurzke was under a duty, both during and after his employment with CZMI, to refrain from directly or indirectly using or disclosing any confidential information belonging to CZMI to any third party, except as authorized by CZMI.  See Elman Decl. Ex. 12 ¶ 4.  In derogation of such duty, Kurzke—only weeks before leaving CZMI—copied confidential files to an external hard drive.  See Kurzke Decl. ¶ 13.  When he left CZMI, he failed to disclose to CZMI that he had retained the Hard Drive, despite representing that he had turned in all company equipment and was not in possession of any confidential information.  See Burton Decl. ¶ 9, Dkt. 148-6.  After commencing employment with Topcon, Kurzke accessed files on the Hard Drive and shared some of them with other employees at Topcon, as well as a third-party vendor assisting Topcon in testing Glaucoma Module.  See Supp. Elman Decl. Exs. 27, 34.

Defendants counter that Kurzke's retention of the Hard Drive was completely innocent because, when he worked for Zeiss, he was instructed to back up his laptop to an external hard drive.  See Elman Decl. Ex. 3 (Kurzke Depo. at 94:18-21).  As a result, Kurzke claims that he believed that the Hard Drive belonged to Zeiss, as opposed to CZMI. He further asserts that he retained possession of the Hard Drive after leaving CZMI because some of his personal files remained on the device.  See Topcon Opp'n at 10.  As for copying files to the Hard Drive after accepting Topcon's job offer and only weeks before leaving CZMI, Kurzke claims that he did so as "part of [his] normal practice of backing up the laptop and in preparation to transfer his work files to his successor, given [his]

upcoming departure from CZMI." See Kurzke Decl. ¶ 13.  These explanations strain credulity.

As an initial matter, the Hard Drive was issued to Kurzke by the Information Technology Department at CZMI, not Zeiss.  See Elman Decl. Ex. 3 (Kurzke Depo. at 95:2-5).  To the extent that Kurzke, in fact, believed that the Hard Drive belonged to Zeiss as opposed CZMI, he should have, at a minimum, attempted to return the hard drive to Zeiss or at least notify Zeiss that it was in his possession.  He did neither.  See Burton Decl. ¶ 12.  Indeed, in view of the clear obligations imposed upon him under the Trade Secret Agreement, Kurzke should have alerted CZMI about the Hard Drive during his exit interview.  See Comet Techs. United States of Am. Inc. v. Beuerman, No. 18-CV-01441-LHK, 2018 WL 1990226, at *4 (N.D. Cal. Mar. 15, 2018) ("[I]f Defendant was at all unclear about whether taking information was a breach of Defendant's duty to maintain secrecy, the exit interview would have dispelled any doubts.").  Instead, Kurzke chose to stay silent about the Hard Drive and his concomitant possession of 35,000 CZMI computer files.  Burton Decl. ¶ 10.[10]

As for his purported concerns related to his personal files, it is axiomatic that Kurzke could have quickly and easily transferred or deleted his personal files from the Hard Drive.  That aside, the personal files on the Hard Drive also were on his laptop.  Yet, Kurzke relinquished his laptop to CZMI but not the Hard Drive.  See Geller Decl. Ex. A (Kurzke Depo. at 110:8-21).  Finally, if Kurzke's actual motivation to retain the Hard Drive was to protect the privacy of his personal information, there would be absolutely no reason for him to have accessed any of the files belonging to CZMI, let alone transmit some of those files

---

[10] Defendants fault CZMI staff for not asking Kurzke about the Hard Drive during his exit interview.  However, staff did not ask about the Hard Drive because they did not know it existed.  See Burton Decl. ¶ 9.  Had they been aware of the Hard Drive, CZMI would have listed the device on the checklist of equipment to be returned.  See id.  Nor would CZMI have reason to ask about the Hard Drive, since Kurzke completed and signed a company Termination Checklist indicating that he had returned all company equipment and that he had "returned all Zeiss property and confidential proprietary documents."  Id. Ex. B.  As noted above, under the terms of his Trade Secret Agreement, Kurzke had no right to possess any of CZMI's confidential or proprietary files after his separation of employment.  See Elman Decl. Ex. 12 ¶ 4.

1  to others at Topcon and a third-party vendor assisting Topcon in the development of

2  Glaucoma Module.

3        Equally untenable is Defendants' explanation for Kurzke's decision to copy CZMI

4  files onto the Hard Drive shortly before starting with Topcon.  Kurzke alleges that he was

5  simply backing up his laptop as part of his normal practice and to facilitate the transfer of

6  files to his successor.  See Kurzke Decl. ¶ 13.  However, neither Zeiss nor CZMI

7  authorized Kurzke to make backups of confidential information (as defined in the Trade

8  Secret Agreement) on external hard drives.  See Burton Decl. ¶¶ 8, 14.  Additionally,

9  Kurzke's claim that he was preparing the files for his successor makes no logical sense,

10  since Kurzke retained the Hard Drive after he left CZMI.

11        Finally, Defendants contend that there was no misappropriation because none of the

12  files Kurzke accessed was used to develop any competing ODx products.  As will be

13  discussed in more detail below, that simply is untrue.  In any event, misappropriation based

14  on "acquisition" is not dependent on the defendant's use of trade secrets.  AUA Private

15  Equity Partners, LLC v. Soto, No. 1:17-CV-8035-GHW, 2018 WL 1684339, at *6

16  (S.D.N.Y. Apr. 5, 2018) ("Courts evaluating claims for misappropriation of trade secrets

17  under the various state UTSAs that define 'misappropriation' in terms nearly identical to

18  the DTSA have found that liability attaches to employees who ... abscond with their

19  employers' trade secrets, even in the absence of any subsequent use or disclosure of the

20  information.").

21        In sum, the Court finds that CZMI has demonstrated a likelihood of success on its

22  claims for misappropriation of trade secrets based on acquisition through improper means.

23  E.g., Cutera, Inc. v. Lutronic Aesthetics, Inc., 444 F. Supp. 3d 1198, 1207-208 (E.D. Cal.

24  2020) (concluding that the plaintiff had demonstrated a likelihood that the defendants

25  misappropriated confidential information where forensic evidence showed information was

26  downloaded from work devices to personal computers); WeRide Corp. v. Kun Huang, 379

27  F. Supp. 3d 834, 848 (N.D. Cal. 2019), modified in part, No. 5:18-CV-07233 EJD, 2019

28  WL 5722620 (N.D. Cal. Nov. 5, 2019) (finding that a former employee's misappropriation

was evidenced by his copying and retaining his former employer's confidential files) (citing cases); Comet Techs. United States of Am. Inc., 2018 WL 1990226, at *4 (finding a likelihood of success based on acquisition of trade secrets by improper means where the defendant, who was subject to confidentiality agreement, denied possessing external memory devices containing the plaintiff's confidential information property during his exit interview but later conceded that he took such devices before going to work for the plaintiff's competitor); see also HighMark Digital, Inc. v. Casablanca Design Centers, Inc., No. CV1806105SJOJPR, 2020 WL 2114940, at *21 (C.D. Cal. Mar. 26, 2020) ("A jury could conclude that Winter misappropriated HighMark's trade secrets when he retained the company's laptop and external hard drive seven to ten business days after he resigned and returned the laptop wiped of its data."); Henry Schein, Inc. v. Cook, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (finding the plaintiff was likely to succeed on its DTSA and CUTSA claims where the defendant, though subject to a confidentiality agreement, "e-mailed and downloaded, to her personal devices, confidential information from HSI before leaving her employment to work at a competitor").

### b)    *Disclosure or Use*

As an alternative matter, CZMI has made a compelling showing of "[d]isclosure or use of a trade secret of another without express or implied consent."  18 U.S.C. § 1839(5).  As noted, Kurzke copied confidential files from his laptop to the Hard Drive after accepting Topcon's offer of employment but before giving notice to CZMI.  Other Former Employees also copied confidential information to external memory devices before leaving CZMI for Topcon.  The timing of their actions "strongly suggests they intended to use the information in their employment with [Topcon]."  Cutera, 444 F. Supp. 3d at 1207 (finding that the confidential information obtained by former employees shortly before joining their former employer's competitor indicated their intention to use the information for the benefit of their new employer); see also Redapt Inc. v. Parker, No. 2:20-CV-00862-JRC, 2020 WL 3128859, at *4 (W.D. Wash. June 11, 2020) ("The timing of [defendant]'s actions, including setting up meetings with [plaintiff]'s competitor, is strong circumstantial

evidence that [defendant] copied the CRM database with the intent to offer confidential information to [plaintiff]'s competitors."); Montana Silversmiths, Inc. v. Taylor Brands, LLC, 850 F. Supp. 2d 1172, 1184 (D. Mont. 2012) (finding that the timing of the individual defendants' employment with the entity defendant's launch of a competing design presented "sufficient circumstantial evidence from which a reasonable jury could conclude that Defendants misappropriated [the plaintiff's] trade secrets").

Defendants' use and/or disclosure of CZMI's trade secrets is further shown by Kurzke's admitted downloading of tens of thousands of confidential files from his laptop and sharing some of that information with Topcon and at least one third party vendor.  In particular, CZMI points to evidence that, while employed by Topcon, Kurzke emailed 145 HFA reports to Calcey, a third-party vendor assisting Topcon in testing Glaucoma Module. See Supp. Elman Decl. Ex. 27.[11]  Defendants do not dispute that Kurzke transmitted those and other HFA and OCT files to persons at Topcon and to Calcey.  See id. Ex. 34.  Nor do they dispute that he was acting in the course and scope of his employment with Topcon, thereby inculpating Topcon.  See Brain Injury Ass'n of California v. Yari, No. 19-CV-5912, 2020 WL 3643482, at *5-*6 (C.D. Cal. Apr. 30, 2020) (finding that misappropriation is "within the scope of employment when it is performed, at least in part, to benefit the employer, though the employer may forbid it").  Rather, Defendants argue that HFA reports are intended for disclosure to third parties and therefore cannot be considered confidential. See Defs.' Surreply at 4.  Citing the deposition testimony of several CZMI employees, Defendants allege that HFA reports are PDF documents that are publicly viewable by the end user and are considered the property of the doctor using the HFA.  See id.  Defendants add that CZMI uses HFA reports for public marketing purposes (such as in brochures and public product demonstrations) and that the file itself is readable by any number of DICOM viewers freely available to the public.  See id. at 5.

---

[11] Kurzke sent at least 145 HFA reports to Calcey, 117 of them were in his possession at CZMI, and 28 that he created after he left CZMI from documents on the Kurzke Hard Drive.  See id. Ex. 24-25.

Defendants' arguments regarding the HFA reports miss the mark.  CZMI is not claiming that *any* HFA report, standing alone, is a confidential trade secret.  Rather, CZMI asserts—and Defendants do not dispute—that it is *the particular set of HFA test reports* that Kurzke copied to and accessed from the Hard Drive that is confidential.  See Pl.'s Rev. Reply at 7-9.  Nor do Defendants challenge CZMI's contention that it expended time and resources assembling reports representing various test results for their usefulness in product testing.  See id.  Indeed, Kurzke himself confirmed the important value of the set of reports, explaining in an email to Calcey that the 145 reports were especially useful because their data patterns reflect "[a] good mix of what we will find in environments where this [Topcon] product will eventually be used."  Supp. Elman Decl. Ex. 27.  These reports facilitated Calcey's ability to test a "crucial" feature of Glaucoma Module, based on criteria provided to Calcey by Kurzke.  See id. Ex. 23, 26.  Indeed, Kurzke informed Calcey that "[w]e will need zero deviations or data extraction issues with these 145 reports to call [Calcey's work for Topcon] a success."  Id. Ex. 27.  Thus, the record persuades the Court that, even if an individual HFA report may not itself be confidential, the particular set of reports assembled by CZMI and copied by Kurzke, which contain a broad spectrum of examination scenarios, has independent economic value from not being generally known to the public.[12]

Defendants also overlooks the distinction between HFA *data* and an HFA *report*. The raw data generated by an HFA (following a patient examination) is in a DICOM format but is not automatically readable by a DICOM viewer because the data is "scrambled" in a manner proprietary to CZMI.  See Supp. Elman Decl. Ex. 4, Dkt. 279-3. Kurzke acknowledged that for Topcon's Harmony software to replace FORUM, Topcon engineers needed a solution so that Harmony could translate raw DICOM data.  See id. Kurzke admitted that it was "possible" that he accessed files from the Hard Drive to assist

---

[12] If Defendants are correct that HFA Reports are readily and publicly available, they fail to explain why they did not obtain the reports through such channels and supply them to Calcey.

the engineers in finding such a solution.  See Elman Decl. Ex. 3 (Kurzke Depo. at 312:5-
11).  Notably, after the engineers communicated with Kurzke, they found a solution so that
Harmony could read HFA data files in their native format.  See id. at 237:12-21.  While the
Court has not been presented with any direct evidence that Kurzke supplied Topcon with
CZMI's proprietary raw data, the record circumstantially supports the inference that he did,
or at least that he used CZMI's proprietary information to assist them in doing so.

In sum, Defendants' use and disclosure of CZMI's HFA data files and reports show
that CZMI will likely succeed in showing misappropriation of these secrets or at least has
raised serious questions going to the merits of such claims.

## 2.    Breach of Contract

CZMI's fourth cause of action alleges that Kurzke, along with other Former
Employees, breached his Trade Secret Agreement.  To state a claim for breach of contract,
express or implied, under California law, a plaintiff must allege: "(1) the contract, (2) the
plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's
breach, and (4) the resulting damage to the plaintiff."  CDF Firefighters v. Maldonado, 158
Cal. App. 4th 1226, 1239 (2008).

Under the terms of his Trade Secret Agreement, Kurzke agreed that he would not:
(1) directly or indirectly, utilize or disclose to anyone outside of Zeiss (or its subsidiaries),
or permit access by unauthorized persons or entities to, any confidential information; and
(2) "[u]nder no circumstances … utilize any, or disclose to any third parties, Company
Confidential Information after [his] termination with Company."  Elman Decl. Ex. 12 ¶ 4.
He also agreed to return all CZMI confidential information and "external storage devices."
See id. ¶ 9.

Kurzke breached the above provisions of his Trade Secret Agreement, inter alia, by
copying files onto and retaining the Hard Drive (which contained CZMI's confidential
information), and by accessing CZMI's proprietary set of test HFA reports and sending
them to a third-party vendor assisting Topcon with the development of Glaucoma Module.
Although Defendants maintain that such reports are not confidential, the Court rejects that

1  contention for the reasons previously discussed.  Kurzke's disclosure to a third party of

2  confidential information belonging to CZMI violates the plain terms of his Trade Secret

3  Agreement.  The Court therefore finds that CZMI has demonstrated a likelihood of success

4  on its breach of contract claim as to Kurzke.

5       **C.   IRREPARABLE HARM**

6       The second requirement for obtaining a preliminary injunction is that the plaintiff is

7  likely to suffer irreparable harm absent the relief requested.  Winter, 555 U.S. at 21.  CZMI

8  contends that there is a presumption of irreparable harm in trade secret cases.  Defendants

9  counter that no such presumption exists.  The Ninth Circuit has not reached the question of

10  whether a court may presume irreparable harm in trade secret cases.  Nonetheless, courts

11  within this District have consistently reached the conclusion that a plaintiff "will suffer

12  irreparable harm if its proprietary information is misappropriated."  Comet Techs. United

13  States of Am. Inc., 2018 WL 1990226, at *5 (citing cases).  Thus, the Court's finding that

14  CZMI is likely to succeed on its misappropriation claims is sufficient to support a finding

15  of irreparable harm.  See id.

16       In the alternative, even without the benefit the aforementioned presumption, the

17  Court is persuaded by CZMI's showing of irreparable harm.  CZMI leads the market in

18  ODx products, including its HFA and FORUM and Glaucoma Workplace software

19  solutions.  E.g., Supp. Elman Decl. Ex. 28 (Wasch Depo. at 321:23-322:2) (statement by

20  CZMI's Product Manager for Glaucoma Workplace that, as of December 2019, there were

21  "essentially no other true competitors to Glaucoma Workplace")).  Topcon is a direct

22  competitor of CZMI and seeks to compete with Harmony and Glaucoma Module.  As

23  discussed above, the record suggests that Topcon, through Kurzke and Former Employees,

24  have acquired, and in some instances used, confidential information belonging to CZMI to

25  assist Topcon in developing Glaucoma Module.  Courts concur that a defendant's ability to

26  gain a competitive advantage through the use of confidential information to develop a

27  competing product is sufficient to constitute irreparable harm.  E.g., Waymo LLC v. Uber

28  Techs., Inc., No. C 17-00939 WHA, 2017 WL 2123560, at *10 (N.D. Cal. May 15, 2017)

1   (defendant's use of plaintiff's trade secrets afforded it a "competitive edge" in the self-

2   driving car industry, which constituted irreparable harm); see also Comet Techs. United

3   States of Am. Inc., 2018 WL 1990226, at *5 ("Plaintiff's expenditure of considerable time

4   and resources on the Da Vinci Project further supports a finding of irreparable harm

5   because disclosure of the Da Vinci Project information will jeopardize Plaintiff's

6   competitive position."); Saini v. Int'l Game Tech., 434 F. Supp. 2d 913, 919 (D. Nev. 2006)

7   ("Public disclosure of a trade secret destroys the information's status as a trade secret.  This

8   harms the trade secret owner by both depriving him of a property interest, and by allowing

9   his competitors to reproduce his work without an equivalent investment of time and

10  money.").

11          Topcon argues that money damages should suffice to remedy any harm to CZMI.

12  Defs.' Surreply at 7.  However, the "loss of trade secrets cannot be measured in money

13  damages ... [because] a trade secret once lost ... is lost forever."  FMC Corp. v. Taiwan

14  Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984).  Moreover, CZMI's potential loss

15  of at least some market share due, in part, to Topcon's ability to accelerate the development

16  and launch of Glaucoma Module as a result of Defendants' conduct would be extremely

17  difficult to quantify.  See Waymo LLC, 2017 WL 2123560, at *11 (finding that it would

18  "likely be futile to attempt, after the fact, to estimate the monetary value of injury suffered

19  from either the loss of [plaintiff]'s competitive position in this nascent industry or the

20  destruction of its trade secrets pertaining to the same").

21          Lastly, Defendants argue that there is no "immediate threatened harm" because

22  Glaucoma Module has been undergoing development for at least two years and that Topcon

23  has not yet sought federal regulatory approval to sell the product.  Defs.' Surreply at 7.

24  However, Topcon has already sold Glaucoma Module in Latin America and obtained

25  preliminary FDA approval for Glaucoma Module for sale in the United States.  See Supp.

26  Elman Decl., Ex. 12 (Schmid Depo at 105:19-108:5); Ex. 13; Ex. 14; Ex. 15. Ex. 16 (Ferro

27  Depo. at 126:3-9).  Thus, the Court is satisfied that the likely irreparable harm discussed

28  above is sufficiently imminent for purposes of a preliminary injunction.

**D.    PUBLIC INTEREST**

The public interest is served by the protection of trade secrets and the enforcement

of contractual commitments made by an employee to his or her employer.  See Henry

Schein, 191 F. Supp. 3d at 1078.  Defendants do not contend otherwise but instead counter

that CZMI's claims are speculative and that the proposed injunction would stifle

competition.  See Topcon Opp'n at 19-20; Defs.' Surreply at 7.

As discussed above, CZMI's claims are far from speculative.  To the contrary, the

evidence shows that Kurzke copied and stored confidential and proprietary information

belonging to CZMI on the Hard Drive and lacked candor regarding his possession of the

Hard Drive at the time of his departure.  After he started working for Topcon, Kurzke

accessed files from the Hard Drive and disclosed them to a third-party assisting Topcon in

the development of Glaucoma Module.  As for stifling competition, Topcon's acquisition

and use of at least some of the trade secrets stored on the Hard Drive to develop a

competing product is not "legitimate" competition.  Waymo, 2017 WL 2123560, at *12.  In

addition, "[w]hile California has a strong public policy in favor of competition, this interest

yields to California's interest in protecting a company's trade secrets."  Bank of Am., N.A.

v. Lee, No. CV 08-5546 CAS(JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008).

The Court finds that the public interest factor favors CZMI.

**E.    BALANCE OF HARDSHIPS**

"To determine which way the balance of the hardships tips, a court must identify the

possible harm caused by the preliminary injunction against the possibility of the harm

caused by not issuing it."  University of Haw. Prof'l Assembly v. Cayetano, 183 F.3d 1096,

1108 (9th Cir. 1999).  As discussed above, CZMI has persuasively shown that it faces

both serious and immediate harm absent an injunction.  See, e.g., WeRide Corp., 379 F.

Supp. 3d at 854.  Defendants respond that "[it] will lose its investment and suffer a

significant hardship, if it is precluded from releasing Glaucoma Module and competing

with CZMI."  Defs.' Surreply at 7.  However, that assertion is conclusory and unsupported.

That aside, whatever hardship Topcon may experience is attributable to its own conduct in

using CZMI's confidential and proprietary information in the course of preparing Glaucoma Module for market.  The Court concludes that the balance of hardships tips sharply in favor of CZMI and support the imposition of a preliminary injunction.

**F.    BOND**

When granting a preliminary injunction, Federal Rule of Civil Procedure 65(c) requires a court to set a security bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Proc. 65(c).  However, Rule 65 "invests the district court with discretion as to the amount of security required, if any." Jorgensen v. Cassidy, 320 F.3d 906, 919 (9th Cir. 2003).  A court may dispense with the filing of a bond if "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." Id.

CZMI requests that the Court impose the requested preliminary injunction without a bond.  See Pl.'s Renewed Mot. at 11-12.  Defendants do not address this request for the bond requirement.  Their silence on this issue waives any objection to CZMI's request for no bond.  See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008) (opposing party waives arguments by not raising them in an opposition).  Waiver aside, the Court finds that there is no realistic likelihood of harm to Defendants because they were never entitled to disclose or use the information taken from CZMI.  See Comet Techs. United States of Am. Inc., 2018 WL 1990226, at *6 ("Put otherwise, there is no likelihood of harm because the TRO would simply enjoin Defendant from doing something Defendant never had a right to do in the first place.").  Moreover, in his Trade Secret Agreement, Kurzke expressly "agrees and consents that [CZMI] shall be entitled to injunctive relief, both preliminary and permanent, without bond." Elman Decl. Ex. 12 ¶ 9.  In view of the circumstances, the Court finds that no bond is necessary.

**IV.   CONCLUSION**

For the reasons stated above,

IT IS HEREBY ORDERED THAT Plaintiff CZMI's Renewed Motion for Preliminary Injunction is GRANTED.

1.      THS and TMS are enjoined from releasing and selling Glaucoma Module to the public, pending further order of the Court.

2.      THS, TMS and Kurzke are enjoined from, directly or indirectly, obtaining, retaining, using, transmitting, disseminating, or disclosing, or attempting to obtain, retain, use, transmit, disseminate, or disclose, any CZMI confidential, proprietary, or trade secret information, including any files obtained from the Hard Drive or during the course of Former Defendants' employment with CZMI.

3.      Because this Order may contain information within the scope of the parties' protective order, this Order shall remain under seal pending further Order of the Court. Within 14 days of the date this Order is filed, the parties shall jointly advise the Court which facts, if any, they contend should be redacted from the public version of this ruling. To the extent any party seeks redaction of any portion of the Court's ruling, such party shall provide the Court with a proposed redacted order for public disclosure.

        IT IS SO ORDERED.

Dated:  03/01/2021

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge