1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5

6    **CARL ZEISS MEDITEC, INC.,**                    Case No. 4:19-cv-04162-YGR

7                    Plaintiff,                        **ORDER**
                                                       **GRANTING IN PART AND DENYING IN PART**
8         v.
                                                       **PLAINTIFF'S MOTION FOR SUMMARY**
9    **TOPCON MEDICAL SYSTEMS, INC.,** *et al*.,       **ADJUDICATION,**

10                   Defendants.                       **DEFENDANTS' MOTION FOR SUMMARY**
                                                       **JUDGMENT, AND**
11
                                                       **PLAINTIFF'S MOTION TO EXCLUDE; AND**
12
                                                       **GRANTING DEFENDANTS' MOTION TO**
13                                                     **EXCLUDE**

14

15        Plaintiff Carl Zeiss Meditec, Inc. ("CZMI") brings this case against defendants Topcon

16   Medical Systems, Inc. and Topcon Healthcare Solutions, Inc. (together, "Topcon"), as well as

17   former CZMI (and current Topcon) employees Tobias Kurkze and Greg Hoffmeyer (the

18   "individual defendants").

19        This suit arises from Topcon's alleged use of "improper means to obtain CZMI trade

20   secrets and confidential information to develop software in an attempt to copy CZMI's market-

21   leading products." (Dkt. No. 484, Corrected Fourth Amended Complaint ("C4AC") ¶ 4 (cleaned

22   up).) The C4AC includes three claims that remain part of this case: (1) trade secret

23   misappropriation under the Federal Defend Trade Secrets Act ("DTSA"), 18. U.S.C. §§ 1836-

24   1839, *et seq.* against all defendants; (2) trade secret misappropriation under the California Uniform

25   Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq.* against all defendants; and (3)

26   claims the individual defendants breached their CZMI employment agreements.[1]

27   _____

28        [1] Plaintiff has since removed their copyright and aiding and abetting trade secret
     misappropriation claims from the case. *See* Dkt. No. 615, Plaintiff's Notice of Non-Opposition to

Plaintiff moves for summary adjudication of three issues relating to their breach of contract claims against defendants Hoffmeyer and Kurzke. Defendants move for summary judgment on plaintiff's trade secret misappropriation and breach of contract claims.[2] Before the Court are also a *Daubert* motion each from both parties and myriad requests to seal documents.[3]

Having carefully considered the parties' briefing, the admissible evidence, as well as the record in this case, and upon further consideration after the August 22, 2023 hearing, the Court **DENIES** defendants' motion to exclude the expert testimony of Mr. Lewis and **GRANTS IN PART** and **DENIES IN PART** the remaining motions.[4] The Court's specific rulings are below.

## I.    BACKGROUND

This case has been hotly contested for several years. The Court therefore assumes parties' familiarity with the record and recounts here only those facts that are not genuinely in dispute and which are necessary for the resolution of the pending motions.

///

Defendants' Motion to Exclude Expert Opinion of Justin V. Lewis Regarding Copyright Damages at 1 ("Plaintiff . . . has decided to remove its copyright infringement claim from the trial of this case."); Dkt. No. 616, Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Adjudication ("Pl's Opp'n") at 18:18-20 ("After careful consideration, CZMI has determined that the most appropriate course is to remove from trial of this case the additional factual and legal issues that an aiding and abetting claim . . . and a copyright claim . . . would involve."). Such claims are therefore **DISMISSED**. Relatedly, defendants' motions to exclude portions of the opinions of plaintiff's experts Dr. Christopher Daft (Dkt. No. 594) and Mr. Justin V. Lewis (Dkt. No. 597) pertaining to CZMI's copyright claim are **DENIED AS MOOT**.

[2] Defendants also move for summary judgment on plaintiff's copyright and aiding and abetting claims. Because such claims are no longer part of this case, defendants' motion is **DENIED AS MOOT** as to such claims only. *See supra* note 1.

[3] Parties' sealing requests are not addressed by this Order. The Court set forth sealing procedures for the outstanding requests to seal in a separate order dated August 15, 2023. Dkt. No. 644, Order Regarding Sealing Procedures. Parties' requests will be addressed in the context of those procedures. To the extent the Court refers herein to material sought to be sealed by the parties, their requests are **DENIED** only for the purposes of this Order.

[4] The Court is advised that plaintiff and defendant Hoffmeyer have settled. Accordingly, this Order does not address parties' motions relative to him.

### A.  <u>Trade Secret No. 1</u>

Plaintiff claims Trade Secret No. 1, which is: "Proprietary and confidential unique collection of a particular set of 145 HFA test reports assembled from CZMI's Demo Database containing a broad set of examination scenarios." (Dkt. No. 616-1, Plaintiff's Response to Defendants' Separate Statement of Facts In Support of their Motion for Summary Judgment ("Pl's Response to Defs' SSF") 1 (cleaned up).)

CZMI's Demo Database contains Humphrey Field Analyzer ("HFA") reports created by CZMI, CZMI clinics, and CZMI collaborators, including the 145 HFA reports comprising Trade Secret No. 1. (Dkt. No. 591-2, Defendant Kurkze's Response and Supporting Evidence to Plaintiff's Separate Statement of Undisputed Facts ("Kurkze Response to Pl's SSF") 11; *see also* Pl's Response to Defs' SSF 8.) The Demo Database is used for demonstration purposes, sales, and marketing, and to demonstrate the value of Zeiss's HFA products. (Kurkze Response to Pl's SSF 11.) To that end, CZMI staff uses the Demo Database to make presentations at trade shows regarding Zeiss's offerings. (Kurkze Response to Pl's SSF 11, 14).

### B.  <u>Trade Secret No. 64</u>

Plaintiff claims the following as Trade Secret No. 64:

Proprietary and confidential competitive analysis, actual and project sales for fiscal years 2014-2020, profits and losses, projected customers, product roadmaps, and commercialization strategies for specific regions, as shown at documents entitled '20170522_Business Plan_Input Retina workplace-including addtl. revenue_SUSTAINING.xlxs', and '1400612-Forum_PLP-Kickoff.pptx.'

(Pl's Response to Defs' SSF 14.) The first of the two documents referenced in this trade secret concerns CZMI's Retina Workplace product, whereas the second identifies some of the product history of CZMI's FORUM product. (Pl's Response to Defs' SSF 15, 17.)

### C.  <u>Trade Secret No. 72</u>

Plaintiff claims Trade Secret No. 72, which is: "The proprietary and confidential encryption/decryption algorithm for the IMG Export Software . . . ." (Pl's Response to Defs' SSF 20.) Trade Secret No. 72 also claims nine specific steps comprising Zeiss' "proprietary and confidential encryption/decryption algorithm" as expressed in human readable source code format. (*See, e.g.*, Dkt. No. 634-5, Decl. of Anthony M. Isola in Support of Joint Stipulation, Ex. D,

1    Redacted Fifth Supplemental Disclosure of Trade Secrets ("Fifth Supplemental Trade Secret

2    Disclosure") at 1-2.)

3          After Mr. Kurzke began working at Topcon, he asked the company to obtain a Zeiss IMG

4    Export License. (Dkt. No. 629-1, Defendants' Response to Plaintiff's Additional Facts in

5    Opposition to Defendants' Motion for Summary Judgment ("Defs' Response to Pl's Add'l Facts")

6    64.)[5] To that end, in June 2018, Topcon purchased a Zeiss Cirrus OCT device through a third

7    party, Dr. Edward Rubinchik, and registered the device to a non-Topcon email address.[6] (*Id.* 61,

8    71.) Topcon then used Dr. Rubinchik's license key to activate the Zeiss IMG Export Software

9    associated with the device. (*Id.* 73, 74). Some open, standard IMG files were then produced by

10   Topcon using the device. (*Id.*) Topcon relied on and analyzed the scrambled and unscrambled

11   output of the IMG Export Software run on the device to develop its DICOM Decoder. (*Id.* 77.)

12        **D.  CZMI Employment Agreement with Mr. Kurzke**

13        CZMI employed Mr. Kurzke from 2015 through 2018. (Kurzke's Response to Pl's SSF 8.)

14              a.  *Mr. Kurzke's Employment Agreement*

15        Mr. Kurzke's employment agreement with CZMI is dated March 19, 2015. (Dkt. No. 577-

16   3, Decl. of Janice Procassini in Support of Defendants' Motion for Summary Judgment, Ex. 1

17   ("Kurzke Agreement").) The relevant portion of the agreement, entitled "Covenant Against Use

18   and Disclosure of Confidential Information" provides:

19        During Employee's employment with Company and thereafter, Employee shall not,
          without Company's prior permission, directly or indirectly, utilize or disclose to anyone
20        outside of Company, or permit access by unauthorized persons or entities to, any
          Confidential Information, [7] and shall take all reasonable precautions to prevent any person
21

22   _____

23        [5] Defendants object to plaintiff exceeding the page limit for their responsive separate
     statement. *See* Defs' Response to Pl's Add'l Facts (noting the objection). This objection is
24   overruled in light of the fact-intensive nature of the instant case, although plaintiff is admonished
     to review this Court's Standing Order, specifically Section 9(c)(3).

25        [6] Purchases of such devices are typically subject to Zeiss' standard contractual licenses,
26   which prohibit, among other things, allowing others to reverse engineer its software. Defs'
     Response to Pl's Add'l Facts Fact 61.

27        [7] The Kurzke Agreement defines "confidential information" to mean:

28        [N]on-public information of value to Company that Employee learned in connection with

4

United States District Court
Northern District of California

or entity access to any of the Confidential Information, other than as required in the performance of Employee's duties with Company. Employee shall not, directly or indirectly, copy, take, send, or remove from Company's premises or computer systems (except with the written consent of Company), any of Company's books, records, client lists, electronic data information, or any other documents or materials containing Confidential Information, other than as required in the performance of Employee's duties with Company. Under no circumstances shall Employee utilize any, or disclose to any third parties, Company Confidential Information after Employee's termination with Company.

(*Id.* ¶ 4.)

  b.  *Mr. Kurzke's Activities*

On April 10, 2018, Mr. Kurzke accepted a job offer with defendant Topcon, a competitor to Zeiss. (Kurzke Response to Pl's SSF 19.) On April 14, 2018, after accepting Topcon's job offer, but before informing CZMI of his resignation, Mr. Kurzke saved files from his company laptop to an external hard drive. (*Id.* 20, 24.) A list of the files stored on that hard drive was later produced by Mr. Kurzke in this litigation. (*Id.* 23.) The list revealed over 35,000 entries. (*Id.*; *see also* Dkt. No. 577-11, Decl. of Jeremy T. Elman in Support of Plaintiff's Motion for Summary Adjudication, Ex. 7 (inventory of such files).) The vast majority of these entries show a last accessed date of April 14, 2018 or earlier, although 1,793 files show a last accessed date of May 2018 or later, at which point Mr. Kurzke was employed at Topcon. (*Id.*; *see also* Kurzke Responses to Pl's SSF 30-31.) DICOM files containing HFA reports prepared by Zeiss were

_____

Employee's employment with Company and that would be valuable to a competitor or other third parties. For example, Confidential Information includes, but is not limited to, information concerning Company's business plans, operations, products, strategies, marketing, sales, inventions, designs, costs, legal strategies, finances, employees, customers, prospective customers, licensees, or licensors; information regarding Company's revenue, rates, and profit margin; information received from third parties under confidential conditions; or other valuable financial, commercial, business, technical or marketing information concerning Company, or any of the products or services made, developed, or sold by Company. Confidential Information does not include any information that is in the public domain at the time of disclosure by Company to Employee or that subsequently comes into the public domain through no violation of this Agreement by Employee or similar agreements by other employees of Company. Nothing in this Agreement should be construed as restricting the Employee's right to engage in legally protected activities under applicable law.

Kurzke Agreement ¶ 4.

among those files he accessed while working for Topcon. (*Id.* 31.)

## II.    LEGAL FRAMEWORK

### A.  *Daubert* Motions

Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified, and their opinion is relevant and reliable. An expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). "An expert should be permitted to testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable." *BP Products North America, Inc. v. Grand Petroleum, Inc.*, Case No. 4:20-cv-0901-YGR, 2021 WL 4482138, at *1 (N. D. Cal. Sept. 30, 2021) (citations omitted).

### B.  Summary Judgment

A party may move for summary judgment on a "claim or defense." Fed. R. Civ. P. 56(a). As a general matter, where the party moving for summary judgment would bear the burden of proof at trial, it bears the initial burden of proof at summary judgment as to each material fact and must show that no reasonable jury could find other than for the moving party. *See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal citation omitted). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine if this is so, the court must view all evidence in the light most favorable to the nonmoving party and draw all justified inferences on its behalf. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alternation and internal quotation marks omitted). Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1  WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720, at 335-36 (3d. ed. 1998)). If,

2  however, the cross-motions are before the court at the same time, the court must consider the

3  evidence proffered by both sets of motions before ruling on either one. *Id.* at 1135-36.

### III.    ANALYSIS

#### A. *Daubert* **Motions**

##### a.  *Motion to Exclude the Expert Opinion of Mr. Lewis*

Defendants move this Court for an order excluding certain testimony from CZMI's

damages expert Justin V. Lewis.[8]

Defendants assert two main arguments[9] to exclude Mr. Lewis's opinions: (i) they are

incorrectly based on a finding of misappropriation of Trade Secrets No. 31 and 46, which the

Court struck from CZMI's complaint; and (ii) damages stemming from CZMI's claim for

intentional interference with contractual relations are no longer part of the case. The Court grants

defendants' motion to strike as to the latter argument[10]  because it is plainly meritorious (and is,

for that matter, unopposed) and analyzes the former.

That argument proceeds in several steps: *First*, defendants assert Mr. Lewis prepared two

damages estimates, one assuming defendants misappropriated Trade Secrets Nos. 1 and 31 as a

pair and another assuming defendants misappropriated Trade Secrets Nos. 46 and 72 as a pair. He

coupled the trade secrets based on the topics which they addressed. Trade Secrets Nos. 1 and 31

---

[8] Defendants specify that their request is to strike the following portions of Mr. Lewis's report: Section 4.2.2 including Figures 11 and 13; Section 4.2.3.1 including Figure 15; Section 4.2.3.2 including Figure 16; Section 4.6; Section 5; and Exhibits 1.0, 1.1., 1.2, 1.4, 1.5, 2.0, 2.1, 2.2, 4.0, and 5.0. *See* No. 601, Defendants' Motion to Exclude Expert Opinion of Justin V. Lewis Regarding Unjust Enrichment and Tortious Interference Damages at 1; *see generally* Dkt. No. 601-3, Decl. of Anthony M. Isola in Support of Defendants' Motion to Exclude, Ex. 1, Expert Report of Justin Lewis ("Lewis Report").

[9] Defendants initially argued that Mr. Lewis's opinions should also be excluded on grounds that they are untested and unverified restatements of the opinions of CZMI staff. However, defendants later withdrew this argument and as such, the Court does not consider it. *See, e.g.*, *id.* at 10; Dkt. No. 628, Defendants' Reply in Support of their Motion to Exclude Expert Opinion of Justin V. Lewis at 2:18-21.

[10] Thus, the Court **STRIKES** Section 4.6 of Mr. Lewis's report.

1   pertained to Zeiss HFA reports, whereas Trade Secrets Nos. 46 and 72 pertained the algorithm

2   which Zeiss uses to generate HFA reports. *Second*, defendants argue that Mr. Lewis therefore did

3   not offer an opinion as to the unjust enrichment damages related to each claimed CZMI trade

4   secret, specifically, rather than in the context of a pair. *Third*, since the Court struck Trade Secrets

5   Nos. 31 and 46 from CZMI's operative complaint, defendants conclude that Mr. Lewis's estimates

6   are no longer relevant, are based on flawed methodology, and should be struck on those grounds.

7       Plaintiff responds by rejecting the notion that Mr. Lewis's damages estimates are premised

8   on Trade Secrets Nos. 1 and 72 having independent value from Trade Secrets Nos. 31 and 46,

9   respectively. They argue that, as between Trade Secrets Nos. 1 and 31, Trade Secret No. 1 is the

10  key trade secret on the issue of Zeiss's HFA reports, and relatedly, that Trade Secret No. 72 is the

11  key trade secret, as between Trade Secrets Nos. 46 and 72, on the issue of the encryption/

12  decryption algorithm in Zeiss's IMG Export Software. Said differently, plaintiff claims Mr.

13  Lewis's estimates are relevant to assessing the harm caused by the alleged misappropriation of

14  Trade Secrets Nos. 1 and 72 even though Mr. Lewis did not provide damages estimates *specific* to

15  Trade Secrets Nos. 1 and 72.

16      The Court agrees with plaintiff that Mr. Lewis's testimony should not be excluded under

17  *Daubert*, although the Court reaches that conclusion without engaging in an analysis of which of

18  the respective trade secrets are "key" to his analysis.

19      As a threshold matter, the Court resolves the parties' rhetorical dispute:  Mr. Lewis did not

20  say in his report or at his deposition that his damage estimates would categorically *not* apply were

21  Trade Secrets Nos. 31 and 46 struck from plaintiff's complaint. When asked at his deposition

22  whether his estimate would apply *only* to Trade Secret No. 1 in the event Trade Secret No. 31 was

23  struck, he essentially said that he had not done that analysis and would need more information.

24  (*See* Dkt. No. 601-5, Decl. of Anthony Isola in Support of Defendants' Motion to Exclude Mr.

25  Justin Lewis, Ex. 3, Excerpts of Deposition of Mr. Lewis at 104:10-105:13.) Mr. Lewis said

26  something similar when asked whether his estimate would apply *only* to Trade Secret No. 72 in

27  the event Trade Secret No. 46 was struck. (*See id.* at 124:8-25 ("I would just need to understand

28  that scenario, but I could envision [the analysis] changing.").) He therefore does *not* say that his

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    damage estimates are unresponsive when, as here, certain of the trade secrets claims he assessed

2    are no longer part of the case.

3    　　　The Court therefore considers whether, against this backdrop, Mr. Lewis's testimony is

4    relevant to the instant case and would assist the jury. *See Estate of Barbarin v. AstenJohnson, Inc.*,

5    740 F.3d 457, 463 (9th Cir. 2014), *overruled on other grounds U.S. v. Bacon*, 979 F.3d 766 (9th

6    Cir. 2020) (establishing that the relevance of the expert's testimony to the instant case is a factor in

7    assessing its admissibility under Federal Rule of Evidence 702). In short, it does.[11] Mr. Lewis's

8    testimony at minimum provides a ceiling of the monetary value of plaintiff's claims as to Trade

9    Secrets Nos. 1 and 72, respectively. The damages associated with the misappropriation of trade

10   secret ophthalmological technologies is also plainly outside the scope of common knowledge and

11   would therefore assist the jury. Defendants are of course welcome to cross-examine Mr. Lewis and

12   may present argument to the jury as to the weight they ought to ascribe to Mr. Lewis's estimates in

13   light of Trade Secrets Nos. 31 and 46 having been struck from the case. *See U.S. v. Sandoval-*

14   *Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006) (proponents of expert testimony are "entitled to have

15   the jury decide upon their credibility, rather than the judge."); *City of Pomona v. SQM N. Am.*

16   *Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Challenges that go to the weight of the evidence are

17   within the province of a fact finder, not a trial court judge. A district court should not make

18   credibility determinations that are reserved for the jury.")

19   　　　In sum, Mr. Lewis's damages estimates are relevant to the instant case and will be helpful

20

21   　　　[11] Defendants cite *LivePerson, Inc.*, *MLC Intellectual Property, LLC*, and *O2 Micro*

22   *International Ltd.* to argue that Mr. Lewis's testimony should be excluded because it does not
     apportion damages at the trade secret level, instead apportioning damages to pairs of trade secrets.

23   However, these cases are distinguishable. In *LivePerson, Inc.*, the court excluded an expert's
     opinion when the expert offered only an assessment of the total harm of the alleged

24   misappropriation of 28 trade secrets. *LivePerson, Inc. v. [24]7.AI, Inc.*, 2018 WL 6257460, at *2
     (N.D. Cal. Nov. 30, 2018). Mr. Lewis's opinions are far more narrowly tailored. The remaining

25   two cases are distinguishable on more fundamental grounds. *MLC Intell. Prop., LLC v. Micron*
     *Tech., Inc.*, 2019 WL 5269014 (N.D. Cal. Oct. 17, 2019) is a patent case, not a trade secret case,

26   and the *O2* order to which defendants cite does not concern a motion to exclude expert testimony.
     *O2 Micro. Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1076 (N.D. Cal.

27   2005).

28

to the jury in assessing damages related to Trade Secrets Nos. 1 and 72. On that basis, the Court deems them admissible. For the foregoing reasons, the Court therefore **GRANTS IN PART** defendants' motion as to Section 4.6 of Mr. Lewis's report, which concerns a claim that is no longer part of this case. Defendants' motion is **DENIED IN PART** as to the rest of Mr. Lewis's testimony.[12]

### b.  *Motion to Exclude the Expert Opinion of Dr. Kardon*

Plaintiff moves to exclude the expert testimony of defendants' expert Dr. Randy Kardon, MD, PhD, Fellowship Director of Neuro-ophthalmology at the University of Iowa and Director of the Iowa City Veteran Affairs Center for Prevention and Treatment of Vision Loss ("Iowa City VA"). (Dkt. No. 600-3, Decl. of Katherine Balatbat, Ex. 1, Expert Report of Dr. Randy Kardon ("Kardon Report") ¶¶ 2-3.) As plaintiff challenges myriad opinions offered by Dr. Kardon, the Court analyzes challenges to Dr. Kardon's report based on the report header under which the paragraph in question falls, addressing each section of the report in turn.[13]

**Comparison of Value of the Zeiss and Topcon Systems (Paragraphs 20-38).** This

---

[12] Plaintiff submits an additional declaration from Mr. Lewis alongside their opposition. *See* Dkt. No. 620-1, Decl. of Justin V. Lewis in Support of Pl's Opp'n to Defs' Motion to Exclude. In the declaration, Mr. Lewis explains that the removal of Trade Secrets Nos. 31 and 46 from the case does not change his damages estimates as to Trade Secrets Nos. 1 and 72, respectively. *Id.* ¶¶ 3-4. Plaintiff casts the declaration as a helpful clarification by Mr. Lewis of his report and deposition testimony. Defendants urge the Court to disregard the declaration as an improper attempt to introduce new evidence into the case after discovery has closed.

The Court determines that Mr. Lewis's declaration at most clarifies the scope of his existing testimony; it does not, in other words, propound a completely different theory, and is therefore admissible. *See Phoenix Light SF Limited v. Bank of New York Mellon*, 2019 WL 5957221, *2 (S.D.N.Y. Nov. 13, 2019) ("Courts must exclude expert declarations filed in response to a *Daubert* motion if it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report. But courts may consider evidentiary details that a declaration provides in support of opinions already expressed in the expert's report.") (cleaned up) (internal citations & quotations omitted).

[13] At the hearing, plaintiff objected to the proffer of Dr. Kardon as an expert rather than lay witness. The Court overruled that objection on the record and reiterates here that Dr. Kardon is qualified as an expert ophthalmologist who uses Zeiss and Topcon systems in the context of his practice. He may offer expert testimony consistent with those qualifications, as set forth herein.

United States District Court
Northern District of California

United States District Court
Northern District of California

portion of Dr. Kardon's report consists of his comparative assessment of two data management systems for ophthalmology practice settings: Zeiss's FORUM system and Topcon's Harmony system. Dr. Kardon opines on, among other things, how well the systems meet the needs of his and similar patients, as well as their pricing. These opinions are plainly relevant to the instant case, in which both Zeiss and Topcon technologies are at issue. Further, Dr. Kardon's insight as a seasoned practitioner and user will be helpful to jurors familiarizing themselves with this industry. On these bases, the Court determines that the testimony contained in paragraphs 20-38 is admissible.[14]

Plaintiff's counterarguments that Dr. Kardon is not equipped to conduct a comparison of Zeiss and Topcon systems and relatedly, that he employs no clear methodology in doing so, both fail to persuade. [15] Dr. Kardon is qualified as a clinician with extensive experience in

_____

[14] At the hearing, parties disputed whether the Court should also strike paragraph 32, in which Dr. Kardon opines on the pricing of Zeiss and Topcon's systems based on his "understanding from talking with [ ] colleagues." Counsel clarified that foundation for this statement at the hearing. The testimony is admissible if the proper foundation is laid. *See* Dkt. No. 613-1, Decl. of Steven Carlson in Support of Defs' Mot. to Exclude Dr. Kardon, Ex. 1 (reproducing an email thread in which Dr. Kardon discusses the pricing of Zeiss and Topcon systems with colleagues and a Zeiss representative).

[15] Plaintiff's additional arguments as to paragraphs 25, 33, 35, and 38 fail to persuade. The Court nonetheless addresses plaintiff's challenges to each paragraph in turn below.

First, plaintiff challenges Dr. Kardon's opinions, at paragraph 25, that Topcon's system is sufficient for providers "in a wide variety of practice settings" and that "[m]ost eye care providers have far fewer demanding needs than the Iowa City [VA]." Plaintiff contends these opinions constitute an improper attempt to extrapolate from limited data points. Plaintiff cites to *Lantec, Inc. v. Novell, Inc.* to support this argument. That case is distinguishable. It stands for the limited proposition that interviews with experts at 2-3 firms in the same metropolitan area is an insufficient basis on which to opine on the worldwide market for a product. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002). Here, Dr. Kardon offers an opinion as to the comparative needs of eye care clinics while (i) himself holding positions at two such clinics, which represent different practice settings; and (ii) based on his referrals, research collaborations, and classes across the country and around the world, and over time. The Court therefore does not view Dr. Kardon's opinion as lacking foundation. Any concern goes to weight, not admissibility.

CZMI also contends with respect to paragraph 25 that, to the extent Dr. Kardon based his expert opinion on referrals, research collaborations, and classes, such "communications" ought to have been fully disclosed and were not. The case on which plaintiff relies stands for a narrower proposition, however. There, in *Icon-IP*, the district court determined that specific phone

ophthalmology, which includes using the Zeiss and Topcon systems in practice settings. *See* Fed. R. Evid. 702; *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (holding that decades of experience in a relevant industry is sufficient to satisfy the "minimal foundation of knowledge, skill, and experience required in order to give 'expert' testimony'" as to practice and norms in that industry).[16]

conversations to particular individuals upon which the expert based his conclusions ought to have been disclosed. *Icon-IP Pty. Ltd. v. Specialized Bicycle Components, Inc.*, 87 F.Supp.3d 928, 949 (N.D. Cal. 2015). Here, Dr. Kardon reasonably and permissibly bases his opinion on professional interactions in a variety of contexts and over time. To the extent plaintiff wishes to attack this foundation, they may do so at trial.

Second, plaintiff does not fully develop their challenge to paragraph 33, which consists of Dr. Kardon recounting the Iowa City VA's switch from Topcon to Zeiss systems due to "high-level decision-making at the [Department of Veteran's Affairs]" and other software interoperability concerns. To the extent CZMI conceives of this paragraph as hearsay, they are mistaken. Dr. Kardon's report provides foundation for him to opine on the Iowa City VA's decision to switch software providers, which he discusses at length and with which he was personally involved.

Third, plaintiff's argument that Dr. Kardon's opinion at paragraph 35 regarding "the price pressure felt by ophthalmology clinicians" is inadmissible hearsay fails to persuade in light of Dr. Kardon's personal involvement with the decision of whether to contract with Topcon or Zeiss, and because plaintiff does not fully develop this argument. CZMI's other argument regarding paragraph 35 fails, as well. To that end, plaintiff avers, for the first time on reply, that Dr. Kardon's use of the word "naturally" marks his opinion as a factual opinion the jury could just as soon draw themselves. That word appears within a paragraph in which Dr. Kardon discusses at length the comparative advantages, specifically with respect to price, of advanced ophthalmological technologies. For the reasons described above, this such observations are within Dr. Kardon's field of expertise and will be helpful to the jury.

Fourth, the Court rejects plaintiff's request to exclude Dr. Kardon's comments in paragraph 38 on the comparative "computing burden" of Zeiss and Topcon systems. Plaintiff argues such opinions are not Dr. Kardon's own but are in fact the opinions of IT staff at the Iowa City VA, which Dr. Kardon has passed off as his own. This is a red herring. Dr. Kardon has first-hand experience with the Iowa City VA's shift from Topcon's system to Zeiss's system and related troubleshooting. *See* Dkt. No. 632-2, Dec. of Katherine Balatbat, Ex. 1, Excerpts of Dr. Kardon's Deposition Transcript at 140:10-21. He need not have relied solely on colleagues to form an opinion as to the computing burdens of the companies' respective technologies.

[16] The Ninth Circuit has established that opinions formed as a result of an expert's personal knowledge and significant experience can be sufficiently reliable and methodologically proper as to be admissible. *See Sandoval-Mendoza*, 472 F.3d at 655 ("When evaluating specialized or technical expert opinion testimony, 'the relevant reliability concerns may focus upon personal

United States District Court
Northern District of California

**Opinions Regarding Alleged Market Harm to Zeiss (Paragraphs 39-50).** Here, Dr. Kardon offers an opinion on Zeiss's alleged "loss of market share and revenue" including in connection with defendants' alleged misappropriation of Zeiss's trade secrets. Specifically, Dr. Kardon expounds on whether Topcon's development of its DICOM Decoder to read outputs of Zeiss's IMG Export Software "could have caused the market harm that Zeiss is alleging" and/or whether other factors may have caused the alleged harm.

The motion to strike is granted in part. Dr. Kardon is not qualified as an expert on market harm. He is not an economist and has conducted no economic analysis. He may experience the impact of such trends, but no evidence before the Court suggests he has experience analyzing them, has conducted independent research on the topic in connection with this expert report, or that other valid scientific theories would support his conclusions. For these reasons, the Court strikes paragraphs 39, 40, 43-44, and 47-50. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995) ("If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'").

Dr. Kardon may testify as to the information in paragraphs 41-42 and 45-46 since the opinions expressed therein are limited to topics, such as "the public standard for the sharing of medical images," that are within his expertise. (*See, e.g.*, Kardon Report ¶ 41.)

**Opinions Regarding HFA Files (Paragraphs 51-56).** This portion of Dr. Kardon's report consists of his opinions on HFA reports, including their customary uses. As relevant here, at paragraph 55, Dr. Kardon writes, "I don't understand how Zeiss can claim that a collection of these HFA reports is a Zeiss trade secret," and at paragraph 56, he refers to "[t]he ability to extract

---

knowledge or experience.'"). Other courts in this district have reached similar conclusions. *See also Icon-IP Pty Ltd.*, 87 F.Supp.3d at 946 (finding an expert's "subjective beliefs" "sufficiently reliable to be admissible" in light of his "extensive experience" and leaving to the jury the question of how much "weight to be accorded his testimony" in light of certain potential shortcomings); *GSI Tech. Inc. v. Cypress Semiconductor Corp.*, 2015 WL 364796, at *2 (N.D. Cal. Jan. 27, 2015) ("Subjective beliefs and opinions" of experts with such personal knowledge or experience "are proper expert testimony" and admissible as such). Plaintiff cites to no controlling or in-district authority that compels a different interpretation of Dr. Kardon's expertise.

1    data off PDF images of HFA reports" as "established in the art."

2        The motion to strike is granted in part. Dr. Kardon is not permitted to draw legal

3    conclusions as to what constitutes a trade secret. Paragraph 55 is excluded on that basis. *See U.S.*

4    *v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) ("[A]n expert cannot testify as to a matter of law

5    amounting to a legal conclusion.") (citations omitted); *see also Caudill Seed and Warehouse Co.,*

6    *Inc. v. Jarrow Formulas, Inc.*, 2019 WL 1435934, at *4 (W.D. Ky. Mar. 29, 2019) ("an expert

7    opinion that an item is or is not a 'trade secret' is impermissible, as it states a legal conclusion.")

8    (citation omitted).

9        As to paragraph 56, the first sentence is not within Dr. Kardon's field of expertise. There,

10   Dr. Kardon appears to offer a legal opinion as to the "ability to extract data off PDF images of

11   HFA reports" as being "established in the art." At the hearing, defendants did not meaningfully

12   contest that Dr. Kardon would have no way of knowing, as a non-lawyer, what the phrase

13   "established in the art" means in the context of patent law. The first sentence of paragraph 56 is

14   therefore excluded for lack of foundation.

15       In addition, plaintiff challenges paragraphs 51-54 as irrelevant (although they do not use

16   this word) in the sense that they "speak only as to present-day matters." The Court disagrees. Dr.

17   Kardon's report states that he has worked with Topcon's Harmony system since 2019 and with

18   Zeiss's Forum system since 2017. (Kardon Report ¶ 16.) His expert opinion is therefore based on

19   experience with CZMI technologies during the entire relevant period (*i.e.*, 2018-19), and with

20   Topcon's system for part of the relevant period. There is no need to exclude these paragraphs for

21   lack of relevance. That objection is overruled.

22       **Further Opinions Regarding Partially Compliant DICOM Files (Paragraphs 57-61).**

23       Here, Dr. Kardon opines on publicly available software "for unscrambling" the data output

24   by Zeiss's machines. He describes his own use of such software and states, at paragraph 61, that

25   his "understanding" is "that the know-how for unscrambling the Zeiss OCT DICOM files is now

26   publicly known, and widely disseminated."

27       The Court rejects plaintiff's request to exclude paragraphs 57-60, in which Dr. Kardon

28   testifies as to the use and availability of such software broadly. CZMI's argument that these

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1  paragraphs should be excluded because they refer to the availability of the open-source software

2  during a time period "long after the misappropriation" of Zeiss's trade secrets in 2018-19 fail to

3  persuade. As a factual matter, Dr. Kardon's report does not specify when the open-source software

4  was posted online. (*See id.* ¶ 58; *see also* Dkt. No. 632-2, Decl. of Katherine Balatbat in Support

5  of Pl's Reply to their Mot. to Exclude, Ex. 2, Excerpts of Dr. Kardon Deposition at 74:10-18.) In

6  addition, the Court rejects plaintiff's characterization of Dr. Kardon's allusion to an article

7  discussing the open-source software as nothing more than pointing to "a document posted to a

8  website" which would not help the jury. (Pl's Mot. to Exclude at 14:19 & n. 6.) Dr. Kardon plainly

9  assists the jury by explaining the value of such a document to the ophthalmology profession. *See*

10  *United States v. Finley*, 301 F.3d 1000,1007 (9th Cir. 2022) (holding that an expert's testimony

11  may assist the jury where "the subject matter at issue [is] beyond the common knowledge of the

12  average layman.").

13    Paragraph 61 is categorically different from paragraphs 57-60, however. There, Dr. Kardon

14  draws a conclusion as to whether methods for unscrambling data from certain Zeiss machines is

15  "publicly known." This conclusion is a bridge too far. Dr. Kardon is not qualified to opine,

16  generally, on the extent to which such methods are "publicly known" as such a conclusion is both

17  (i) impossible to test in its current formulation and without foundation; and (ii) is reserved for the

18  jury. As such, paragraph 61 is excluded.

19                    ***

20    For the foregoing reasons, the Court **GRANTS** plaintiff's motion to exclude as to 39-40, 43-

21  44, 47-50, 55, the first sentence of 56, and 61. Plaintiff's motion is **DENIED** as to the remainder of

22  Dr. Kardon's testimony.

23    **B.  Trade Secret Claims**

24      a.  *Trade Secret No. 1*

25    Defendants move for summary judgment on plaintiff's federal and state trade secret

26  misappropriation claims[17] relative to Trade Secret No. 1, arguing that plaintiff has not shown they

27

28    [17] The Ninth Circuit has acknowledged that the definition of "trade secret" is similar under federal and California law. *Compare* 18 U.S.C. § 1839(3) *with* Cal. Civ. Code § 3426.1(d); *see*

took reasonable steps to maintain the secrecy of Trade Secret No. 1 and on that basis, it is not a trade secret at all.

Under California law, a trade secret is "information, including a formula, pattern, program, devise, method, technique, or process that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).

The Court begins by clarifying the scope of the relevant inquiry. The parties dispute whether individual HFA reports comprising the collection of reports claimed as Trade Secret No. 1 were made public by CZMI during the relevant period. For example, defendants point to the fact that CZMI allegedly disclosed certain reports to research partners and ask the Court to interpret such disclosure as fatal to CZMI's misappropriation claims. However, these arguments are immaterial. In Trade Secret No. 1, CZMI asserts trade secret protection over a purported "*unique collection*" of 145 HFA reports which they have purportedly curated.  Thus, defendants' focus on the use of individual HFA reports does not compel judgment as a matter of law.[18]

With respect to whether CZMI put reasonable measures in place to safeguard the secrecy

_____

*InteliClear, LLC, v. ETC Global Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020) (observing that CUTSA defines trade secrets similarly to the DTSA). Because this motion is resolved principally on definitional grounds and parties do not raise any relevant distinctions between California and federal trade secret law, the Court does not examine plaintiff's DTSA and CUTSA claims separately.

[18] Among the relevant trial inquiries will be whether the *collection* of those particular reports meets the definition of a trade secret. *See Experian Info. Solutions, Inc. v. Nationwide Marketing Services Inc.*, 893 F.3d 1176, 1188 (9th Cir. 2018) (finding that a collection of publicly available information can be a trade secret when, among other things, efforts are taken to safeguard the confidentiality of the collection).

United States District Court
Northern District of California

1    of the *collection* of HFA reports they claim as Trade Secret No. 1,[19] defendants claim CZMI did

2    not. They assert plaintiff has offered no evidence that CZMI took steps to protect the secrecy of

3    Trade Secret No. 1; that Trade Secret No. 1 is therefore not in fact a trade secret; and

4    consequently, that plaintiff's misappropriation claims as to Trade Secret No. 1 must fail. In

5    response, plaintiff argues that defendants have failed to show that the collection of 145 HFA

6    reports claimed as Trade Secret No. 1 was publicly disclosed and therefore lost its trade secret

7    protection. Further, plaintiff argues that even if individual reports were drawn from the Demo

8    Database and used for promotional purposes, only portions of the reports were used, and the

9    portions used would not permit a viewer to reproduce the reports themselves.

10        The Court's analysis begins by recounting the relevant portions of the evidence upon

11    which the parties rely, namely the declaration and deposition of CZMI employee Neil D'Souza.

12        **Use of Demo Database for Promotional Purposes.** In relevant part, Mr. D'Souza

13    provides descriptions of how CZMI uses the Demo Database for promotional purposes. (Dkt. No.

14    577-5, Decl. of Neil D'Souza in Support of Pl's Mot. for Summary Adjudication ¶ 15.) This

15    involves "show[ing] a screenshot of a report on a computer screen from the Demo Database . . . to

16    explain how to use CZMI's products." (*Id.*) However, the "image" shown to customers (or would-

17    be customers) "does not disclose the underlying data in a way that reveals any CZMI trade secret

18    or that would allow reproduction or use by a company besides CZMI." (*Id.*)

19        **Customers' Access to Demo Database HFA Reports.** Mr. D'Souza clarified at his

20    deposition that, in providing the product demonstration described above, CZMI does not "hand[]

21    over any of th[e HFA] reports to customers." (Dkt. No. 591-8, Decl. of Steven Carlson in Support

22    of Defs' Mot. for Summary Judgment, Ex. 4, Defendants' Excerpts of D'Souza Deposition (Defs'

23    Excerpts of D'Souza Deposition") at 45:13.) Instead, the demonstration is "displayed on [CZMI's]

24

25        [19] Because arguments concerning whether plaintiff disclosed specific reports (but not the

26    collection itself) are immaterial, the Court declines to reach parties' dispute concerning the
      testimony proffered by Dr. Milan Sonka. Plaintiff's objection to Dr. Sonka's testimony is

27    consequently **DENIED WITHOUT PREJUDICE** to being refiled should defendants seek to offer Dr.
      Sonka's testimony at trial.

28

1  device," and attendees are not permitted to "take any reports with them." (*Id.* at 45:14-16.)

2      **Disclosure of Demo Database HFA Reports.** Lastly, when asked at his deposition

3  whether the Demo Database HFA reports used for promotional purposes are "within the public

4  domain," Mr. D'Souza answered in the negative: "They're not within the public domain." (Dkt.

5  No. 616-6, Decl. of Katherine Balatbat in Support of Pl's Opp'n, Ex. 2, Plaintiff's Excerpts of the

6  Deposition of Mr. D'Souza ("Pl's Excerpts of D'Souza Deposition") at 86:24-87:2.)[20]  He then

7  justified his response, explaining, "The HFA reports are not accessible to anybody. The only it's—

8  it's seen in public is in a demonstration. We do not hand over any reports to anybody. We do not

9  provide them screen captures." (*Id.* at 87:7-11.)

10      In sum, the above excerpts from Mr. D'Souza's declaration and deposition transcript

11  describe a consistent story about CZMI's use of the Demo Database to show customers and

12  would-be customers about Zeiss products. While Mr. D'Souza explains that CZMI sometimes

13  makes limited screenshots of certain HFA reports available to such audiences, he repeatedly

14  cautions that (i) such images represent only a portion of the HFA reports themselves and (ii) such

15  reports are not provided directly to attendees (only shown on a CZMI device). Notably, Mr.

16  D'Souza did not offer testimony as to what CZMI did or did not do with respect to the *collection*

17  of 145 HFA reports claimed as Trade Secret No.1; his testimony does *not* establish, for instance,

18  whether the collection was pulled from the Demo Database and used for promotional purposes.

19      Against this backdrop, it would be far too speculative for the Court to find, as a matter of

20  law, that defendants have proven plaintiff failed to safeguard the confidentiality of the collection

21  of reports claimed as Trade Secret No. 1. Because a triable issue exists as to the measures CZMI

22  put in place to safeguard the confidentiality of Trade Secret No. 1 and whether the collection was

23  publicly disclosed for promotional purposes, defendants' motion fails.[21] The Court therefore

24  _____

25      [20] *See also* Dkt. No. 591-41, Decl. of George Miller in Support of Defs' Mot. for Summary
26  Judgment, Ex. 40, Transcript of Deposition of Claudia Wasch ("Wasch Deposition Transcript") at
    129-31 (indicating that Ms. Wasch, a Zeiss employee, "shared [HFA] reports with customers for
27  testing purposes" and saw no issue with using HFA reports in marketing collateral but not
    testifying that the *collection* was disclosed).

28      [21] None of the cases cited by defendant compel a different result. Defendant invokes

**DENIES** defendants' motion for summary judgment as to plaintiff's misappropriation claims relative to Trade Secret No. 1.

> b.   *Trade Secret No. 64*

Defendants move for summary judgment on plaintiff's claim that defendants misappropriated Trade Secret No. 64 on the grounds that plaintiff offers no evidence that it suffered damages as a result of the alleged misappropriation.

The "plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis supplied). Thus, where damages is an element of plaintiff's claim, summary judgment is appropriate where they have not made a sufficient proffer of the harm suffered. *See McGlinchy v. Shell Chem. Co*, 845 F.2d 802, 808 (9th Cir. 1988) (affirming entry of summary judgment where plaintiff "did not make a showing sufficient to establish the amount, causation, or fact of damages"); *see also Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd*, 525 F.Supp.3d 1145, 1245 (S.D. Cal. 2021) ("Where a plaintiff fails to introduce evidence of damages, summary judgment is appropriate where the underlying claims require proof of damages.") (citing *Weinberg v. Whatcom Cty.*, 241 F.3d 746, 752 (9th Cir. 2001).)

Here, plaintiff's evidence of damages is fleeting. CZMI's damages expert, Mr. Lewis, scarcely mentions Trade Secret No. 64 in his report. He opines that "Topcon's unjust enrichment" is derived, in part, from "Topcon's saved marketing and sales development costs due to Topcon's misappropriation of CZI Trade Secret 64." (Lewis Report at 43.) In a footnote, Mr. Lewis further opines that: "There are also facts supporting that Topcon was unjustly enriched due to saved marketing and sales development costs, resulting from Topcon's misappropriation of CZMI Trade Secret 64. However, there is no evidence available to me from which I can calculate damages

---

myriad authority for the unremarkable proposition that content that has been publicly disclosed cannot be claimed as a trade secret. *See, e.g.*, *Ruckelhaus*, 467 U.S. at 1002. However, such authority does not cure the evidentiary shortcoming identified above.

United States District Court
Northern District of California

1    arising from such allegation." (*Id.* at 43 & n. 362.)

2    The above-referenced excerpts are striking in that they are offered without context and do

3    not purport to evidence harm suffered by CZMI as a result of defendants' activities. Trade Secret

4    No. 64 is referenced virtually nowhere else in Mr. Lewis's 64-page report, and Mr. Lewis never

5    explains what he means when he writes, "There are also facts supporting that Topcon was unjustly

6    enriched" by the alleged misappropriation of Trade Secret No. 64. The Court surely does not treat

7    Mr. Lewis's admission that "there is no evidence available to me from which I can calculate

8    damages" to mean that *no* such evidence exists anywhere. However, it *is* the case that plaintiff has

9    failed to proffer any such evidence in the form of Mr. Lewis's testimony *here*.

10    Aside from Mr. Lewis's report, which is of little value for the reasons already stated,

11    plaintiff offers no evidence of damages arising out of the alleged misappropriation of this trade

12    secret. Their last-ditch attempt to survive summary judgment by claiming that a jury could

13    nonetheless award CZMI reasonable royalties as damages fails to persuade in light of the

14    evidentiary shortcomings identified above and because none of the four cases to which they cite

15    require an alternative result.[22]

16    Plaintiff's misappropriation claims regarding Trade Secret No. 64 therefore fail as a matter

17

18    _____

    [22] Each such case is readily distinguishable and do not persuade. First, plaintiff invokes
19    *LinkCo, Inc. v. Fujitsu Ltd.* for the proposition that "a reasonable royalty is the best measure of
    damages in a case where the alleged thief made no profits." 232 F.Supp.2d 182, 186-87 (S.D.N.Y.
20    2002). Here, plaintiff asserts that Topcon's sales of their Harmony software increased after they
    obtained Trade Secret No. 64 (albeit without reference to evidence). CZMI did not explain how
21    *LinkCo* would apply given plaintiff's position that Topcon *did* profit from the misappropriation of
    the trade secret.

22
    Second, plaintiff relies on *Secure Energy, Inc. v. Coal Synthetics, LLC*, *DSPT*
23    *International Inc. v. Nahum*, and *Cassino v. Reichhold Chemicals, Inc.* to argue that "expert
    testimony may not be necessary for the jury to award reasonable royalty damages." *Secure*
24    *Energy, Inc. v. Coal Synthetics, LLC*, 708 F.Supp.2d 923, 933 (E.D. Mo. 2010). Assuming without
    deciding that plaintiff's reading of these cases is correct, this does not compel a different result.
25    Indeed, the point is that plaintiff has not offered *evidence* of damages stemming from the
    misappropriation of their trade secret, not that they have failed, specifically, to introduce *expert*
26    *testimony* to that effect. Furthermore, *DSPT International* and *Cassino* are trademark and age
    discrimination cases, respectively, not trade secret cases and are also distinguishable on that basis.
27    *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213 (9th Cir. 2010); *Cassino v. Reichhold Chemicals,*
    *Inc.*, 817 F.2d 1338 (9th Cir. 1987).
28

United States District Court
Northern District of California

of law. *McGlinchy*, 845 F.2d at 808 (affirming entry of summary judgment where the party with the burden to prove damages had "no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages"); *see also Lumens Co., Ltd. v. GoEco LED LLC*, *et al.*, 2018 WL 1942768, at *5 (C.D. Cal. Jan. 3, 2018) ("Damages that are speculative, remote, imaginary, contingent, or merely possible cannot serve as the legal basis for recovery.") (citation omitted). For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment as to plaintiff's misappropriation claim relative to Trade Secret No. 64.

### c.  *Trade Secret No. 72*

Defendants move for summary judgment on plaintiff's federal and state misappropriation claims relative to proposed Trade Secret No. 72. Specifically, defendants assert plaintiff has not identified an act of misappropriation by defendants and thus the claims fail for that reason.

"Under CUTSA, misappropriation of a trade secret may be achieved through three types of conduct: acquisition, disclosure, or use." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal.App.4th 210, 222 (2010), *disapproved of on other grounds*, *Kwikset Corp. v. Superior Ct.*, 51 Cal.4th 210 (2011) (cleaned up) (citation omitted). Said differently, "misappropriation" can encompass "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret . . . ." Cal. Civ. Code § 3426.1(b).

Here, several relevant undisputed facts bear on whether defendants misappropriated Trade Secret No. 72. First, the parties do not dispute that defendants never possessed the IMG Export Software source code. Second, it is undisputed, for the purposes of this motion only, that defendants improperly obtained a license to use the Zeiss IMG Export Software, which they ran and subsequently reverse engineered.[23] In light of these undisputed facts, the inquiry becomes: Did

---

[23] At the hearing, defendants conceded, for the purpose of their pending motion only, that they improperly obtained a software license to use Zeiss's IMG Export Software, which they later reverse engineered. The Court therefore considers defendants' unlawful reverse engineering to be undisputed.

United States District Court
Northern District of California

defendants' actions with respect to unlawfully reverse engineering the IMG Export Software comprise acquisition and/or use of the algorithm claimed as Trade Secret No. 72, even if defendants never accessed the IMG Export Software source code?

To answer this question, the Court turns first to the expert testimony proffered by the parties regarding the process by which defendants reverse engineered the IMG Export Software and created their DICOM decoder.

Defendants contend their decoder may achieve the same output data as the algorithm claimed as Trade Secret No. 72 but that the similarities between their DICOM decoder and the Zeiss algorithm stop there. They rely on their expert Mr. Nikolaus Baer's report to assert that their decoder is categorically different from Zeiss's trade secret algorithm, and that on that basis, defendants cannot be said to have acquired or used the algorithm at any point. (*See* Dkt. No. 591-22, Decl. of Scott Carlson in Support of Defs' Mot. for Summary Judgment, Ex. 18, Excerpts of Expert Report of Nikolaus Baer ¶ 477 ("[T]here is no evidence that Topcon's DICOM Decoder is derived from CZMI's IMG Encryption Software, Encoding/Scrambling Source Code or Decoding/ Unscrambling Source Code. The DICOM Decoder uses a different method for unscrambling the data . . . .").)

Plaintiff proffer findings by their own technical expert, Dr. Christopher Daft, to contradict Mr. Baer's claims. Dr. Daft reviewed the process by which Topcon employee Artur Kowalski reverse engineered the Zeiss IMG Export Software's encryption/decryption algorithm. He explained that Mr. Kowalski compared "encrypted data from the [Zeiss] Cirrus machine with the decrypted output using the IMG Export Software."(Dkt. No. 594-3, Decl. of Kevin M. Pasquinelli, Ex. 1, Expert Report of Dr. Christopher Daft ("Daft Expert Report") ¶ 123.) Dr. Daft continued, "Once [Mr. Kowalski] had identified the steps used by CZMI to encrypt the was straightforward for [him] to write code which did the same thing as IMG Export, which was called 'Cirrus CSI' and was incorporated into the [Topcon] Harmony product release." (*Id.* ¶ 124.) Said differently, "With the benefit of [Zeiss's] IMG Export Software, Mr. Kowalski deduced the algorithm" and how it worked. "Once Mr. Kowalski knew the algorithm, he could recreate the details," and that is

1  what he did.[24] (*Id.* ¶¶ 125-26.)

2       Relevant here, Dr. Daft's rebuttal report to Mr. Baer contains additional, relevant insights,

3  which plaintiff did not raise at the hearing, but which the Court nonetheless found instructive.

4  First, Dr. Daft takes Mr. Baer to task for what he characterizes as asserting that the Topcon

5  decoder is different from Zeiss's trade secret algorithm because they are written in different

6  programming languages. (Dkt No. 596-10, Decl. of Anthony Isola in Support of Defs'

7  Administrative Motion to Consider Whether CZMI's Materials Should be Sealed, Ex. 4, Rebuttal

8  Report of Dr. Christopher Daft ¶ 14.) Dr. Daft summarized his point as follows: "Mr. Baer's

9  contention" that the DICOM decoder and Zeiss trade secret algorithm are different "makes no

10  sense as he seems to be claiming that a series of steps is not the same because, for example, it is

11  written in a different computer language, such as using Spanish instead of English." (*Id.*)

12       Second, Dr. Daft emphasized the similarity between the Zeiss trade secret algorithm and

13  Topcon DICOM decoder, writing:

> Mr. Baer opines that 'while the Topcon DICOM Decoder Source Code implements a data
> unscrambling algorithm, it has no functional commonality to the IMG License Source
> Code and is not derived therefrom.' Mr. Baer is incorrect and fails to address the
> apparently undisputed fact that Zeiss's IMG Export Software and Topcon's DICOM
> decoder create the same output when given the same input. Therefore, contrary to Mr.
> Baer's unsupported claim, the functionality is identical and supports my opinion that the
> Zeiss OCT algorithm was used by Topcon.

18  (*Id.* ¶ 15.)

19       Further, while Dr. Daft agrees with Mr. Baer that "the *implementation* is not identical"

20  across the Zeiss algorithm and Topcon decoder because "the way [the Topcon decoder] uses

21  memory is different and the steps are described differently," the algorithm and decoder are "use[d]

22  for the same end, and the distinction in means is superficial." (*Id.* ¶ 16.) (emphasis in original)

23       Having reviewed the expert testimony of both Mr. Baer and Dr. Daft, the Court determines

24  that triable issues exist as to whether: (i) in unlawfully reverse engineering the IMG Export

25

26       [24] Dr. Daft proceeded to explain the technical steps by which the Zeiss and Topcon
decoding algorithms achieved similar outputs. While the technical details need not be recounted
27  here, the Court notes that Dr. Daft compared the steps taken by plaintiff's algorithm and
defendants' decoder, at one point writing that "CZMI's algorithm is implemented in the following
28  Topcon code sections . . . ." Daft Expert Report ¶ 132.

Software, defendants essentially "deduced" the Zeiss algorithm claimed as Trade Secret No. 72; and (ii) separately, whether defendants' decoder is substantially similar to the Trade Secret No. 72.[25] The resolution of these genuine disputes of material fact will be dispositive to plaintiff's trade secret claim as to Trade Secret No. 72. This is because courts have found that improper reverse engineering resulting in the acquisition and/or use of a trade secret (or a product that is substantially similar to a trade secret) is actionable misappropriation. *Alcatel* and *Minnesota Mining*, both of which parties address in their briefs, illustrate this point.[26]

Alcatel involved claims that a competitor misappropriated the trade secrets of a company that designed, manufactured, and sold telephone switching systems equipment. *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772 (5th Cir. 1999). At trial, the "jury found that [defendant] misappropriated [Alcatel's] trade secrets in its operating system software and [ ] firmware." *Id.* at 784. The Fifth Circuit found there was sufficient evidence for the jury to determine that defendant "obtained [Alcatel's] trade secrets through improper means" by "unlawfully ma[king] a copy of [Alcatel's] operating system software" and "us[ing] the knowledge it gained from the purloined software to interpret the trade secrets contained in [Alcatel's] firmware." *Id.* at 785. Said differently, the Fifth Circuit viewed efforts to derive and interpret a trade secret from improperly obtained software as grounds to find trade secret acquisition.[27] This is similar to the instant case,

---

[25] The Court's use of the phrase "substantially similar" here is intentional. It is not necessary for defendants to have acquired or used the algorithm claimed as Trade Secret No. 72 in exactly the same form in order for defendants' acquisition and/or use to be actionable as trade secret misappropriation. *See, e.g.*, *Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1294-95 (5th Cir. 1970) ("To be subjected to liability one need not use the secret in exactly the form in which he received it, and he may be liable for using it with modifications or improvements effected by his own efforts. Differences in detail do not preclude liability is substantially the process is derived from the other's secret.") (citation omitted).

[26] *Silvaco*, on which defendants rely, is inapposite. That case involved no allegations of improper reverse engineering and is distinguishable on that basis. *See Silvaco Data Sys.*, 184 Cal.App.4th at 223 ("Intel's only conduct in this matter, so far as the record shows, was to execute (run) the software . . . .").

[27] While *Alcatel* applies Texas trade secret law, the definition of trade secret misappropriation thereunder is roughly equivalent to the definition of misappropriation under CUTSA. The case is therefore instructive, even if it is not controlling. *Alcatel USA, Inc.*, 166 F.3d

where parties dispute the extent to which defendants derived (and therefore, acquired) the algorithm claimed as Trade Secret No. 72 from the IMG Export Software they improperly obtained from Dr. Rubinchik.

*Minnesota Mining* is also similar. There, defendants received a product sample containing a trade secret resin from an individual who stole the sample. *Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 1991 WL 441901, at *46 (D. Minn. Apr. 30, 1991). Defendants reverse engineered the sample to isolate and identify the "key novel, secret ingredient" resin, and then designed their own product based on a similar chemical compound. *Id.* at *46-*48. The court determined that defendants both acquired and used the trade secret resin by deriving it from the sample and incorporating a similar compound into their products. *Id.* at *63. Here, as in *Minnesota Mining*, defendants are alleged to have acquired and used Trade Secret No. 72 by deriving it from the IMG Export Software and building their own decoder based on its encryption/decryption steps.

In sum, the Court determines that a triable issue exists as to whether defendants acquired and/or used the algorithm claimed by plaintiff as Trade Secret No. 72. Thus, defendants' motion for summary judgment on plaintiff's misappropriation claims relative to Trade Secret No. 72 is DENIED.

### C. Breach of Contract Claim Against Mr. Kurzke

Defendants move for summary judgment on plaintiff's breach of contract claims against Mr. Kurzke. Plaintiff moves for summary adjudication on three issues related to such claims: (i) the execution of Mr. Kurzke's CZMI employment agreement; (ii) CZMI's performance of its obligations thereunder; and (iii) Mr. Kurzke's breach of the agreement in connection with his alleged misuse of the 145 HFA reports comprising Trade Secret No. 1.[28] The Court's analysis of

---

at 784.

[28] Plaintiff's motion seeks summary adjudication on other theories of breach, including that Mr. Kurzke breached his employment agreement with CZMI by failing to return CZMI property upon termination of his employment. At the hearing on the pending motions, however, plaintiff's counsel repeatedly and explicitly informed the Court that the only theory of breach on which plaintiff was proceeding is the alleged misuse of the collection of HFA reports claimed as Trade

United States District Court
Northern District of California

these pending motions proceeds as follows. First, and as a threshold matter, the Court assess the enforceability of the Kurzke Agreement under California law, which undisputedly governs the agreement. Second, the Court turns to the merits of parties' respective motions.

　　　　　　a.　*Enforceability of the Kurzke Agreement*[29]

The parties dispute, as a threshold matter, whether the Kurzke Agreement is enforceable under California law.

California law provides that "every contract by which anyone is restrained from engaging in a lawful profession trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600; *see also id.* at § 16601 (establishing narrow exceptions from this general rule for sales of "the goodwill of a business," where "any owner of a business entity sell[s] or otherwise dispos[es] of all of [their] ownership interest in the business entity," or where certain other exceptions regarding the transfer of ownership interests or assets are met); *accord Chamberlain v. Augustine*, 172 Cal. 285, 289 (1916) ("The statute makes no exception in favor of contracts only in partial restraint of trade."). The California Supreme Court has characterized the above rule as embodying the state's "strong public policy against noncompetition agreements." *Advanced Bionics Corp. v.*

---

Secret No. 1. The Court takes therefore considers any other theories of breach, including those previously stated by plaintiff, to be withdrawn and/or waived.  The Court therefore limits its analysis of Mr. Kurzke's alleged breach of his CZMI employment agreement to that theory.

[29] Plaintiff argues that defendant must proffer evidence that the enforcement of Mr. Kurzke's employment contract would restrain his future employment prospects. *See* Pl's Opp'n at 23:17-20. Facial challenges under Section 16600 are entertained by California courts without the imposition of such evidentiary burdens; the Court does not require one here. *Dowell v. Biosense Webster, Inc.,* 179 Cal.App.4th 564, 579 (2009); *see generally D'Sa v. Playhut*, 85 Cal.App.4th 927 (2000).

Separately, the parties disagree as to whether the Court is barred from even considering the enforceability of the agreement by the law of the case doctrine. *Compare* Pl's Opp'n at 21:6-10 *with* Defs' Reply *generally.* The Court determines that the law of the case doctrine does not apply. The previously issued order at issue simply denied a motion to dismiss plaintiff's breach of contract claim against Kurzke, among others. "A denial of a motion to dismiss establishes *only* that the claims are plausible; it does not [necessarily] establish the merits of the claim." *Andrews Farms v. Calcot, Ltd.*, 693 F.Supp.2d 1154, 1166 (E.D. Cal. 2010) (citing, in part, *Pearson v. Dennison*, 353 F.2d 24, 28 (9th Cir. 1965) for the proposition that a denial of a motion to dismiss does not constitute the "law of the case")). For that reason, the Court does not treat the enforceability of the Kurzke Agreement as legally settled.

1    *Medtronic, Inc.*, 29 Cal.4th 697, 706 (2002).

2    Applying California law, the Ninth Circuit has sought to clarify "what constitutes a

3    'restraint of a substantial character' under [S]ection 16600." *Golden v. California Emergency*

4    *Physicians Medical Group*, 896 F.3d 1018, 1023 (9th Cir. 2018) (citation omitted). The Ninth

5    Circuit concluded that "California cases suggest [ ] the standard is undemanding," and that "a

6    contractual provision imposes a restraint of a substantial character if it significantly or materially

7    impedes a person's lawful profession, trade, or business." *Id.* at 1023-24 (citation omitted). This

8    standard is met when the "restraining effect" of the contractual provisions are "significant enough

9    that [their] enforcement would implicate the policies of open competition and employee mobility

10   that animate [S]ection 16600." *Id.* at 1024 (citation omitted).

11   California appellate courts, not its Supreme Court, have addressed whether an employer

12   may, consistent with Section 16600, enjoin employees from using confidential information of that

13   employer after their employment ends.  In *AMN Healthcare, Inc.* and *Galante*, two different courts

14   ruled that contractual terms imposing such restrictions are violative of Section 16600. *See, e.g.*,

15   *AMN Healthcare, Inc.*, 28 Cal.App.5th at 940 ("[S]ection 16600 precludes an employer from

16   restraining an employee from engaging in his or her 'profession, trade, or business,' even if such

17   an employee uses information that is *confidential but not a trade secret*.") (emphasis supplied).

18   Federal courts applying California law have taken their cue from these courts. *See, e.g.*,

19   *K.T.I. Hydraulics, Inc. v. Palmersheim*, 2022 WL 17100470, at *6 (C.D. Cal. Aug. 11, 2022)

20   ("The clear import of the caselaw interpreting Section 16600 is that the breach of contract claim

21   cannot be based on post-employment competitive activity or even on [d]efendant's use of

22   confidential (but not trade secret) information post-employment."); *see also Aramark*

23   *Management, LLC v. Borgquist*, 2021 WL 9145423, at *2 (C.D. Cal. Dec. 28, 2021) ("Permitting

24   an employer to restrict post-employment endeavors based on an employer's amorphous definition

25   of what constitutes confidential or proprietary information (but not a trade secret) would run afoul

26   of Section 16600's plain language and its purpose of promoting open competition."). Importantly,

27   this does not mean that breach of contract claims based on misuse of trade secret or confidential

28   information *before an employee's departure* from their employer or based on misuse of trade

United States District Court
Northern District of California

1    secret information *after such departure* are void under Section 16600. *See Palmersheim*, 2022 WL

2    17100470, at *6.

3            Here, Mr. Kurzke's CZMI employment agreement imposes, at Paragraph 4, post-

4    employment obligations relating to confidential information where such "confidential

5    information" is not limited to trade secrets. Under the foregoing authority, the Court therefore

6    determines Paragraph 4 is void under Section 16600 but *only* to the extent it imposes post-

7    employment obligations on Mr. Kurzke with respect to *confidential* Zeiss information that is not a

8    Zeiss trade secret.[30]  The Court does not invalidate the agreement on this basis, however, opting

9    instead to sever the obligations that California law will not countenance.[31]  Mr. Kurzke's post-

10   employment obligations with respect to Zeiss trade secret information are not affected by this

11   ruling and remain in force.

12           Plaintiff's counter arguments that California law does not require the invalidation of the

13   Kurzke Agreement's post-employment obligations as to confidential (but not trade secret)

14   information fail to persuade. CZMI cites to three unpublished cases for the proposition that,

15   contrary to the line of cases summarized above, California law permits the enforcement of

16   contractual terms limiting the use and disclosure of confidential business information by former

17   employees on a post-employment basis, like the Kurzke Agreement. The Court declines to follow

18   them for the reasons articulated below.

19           First, plaintiff cites *SolarCity Corp. v. Doria* and explains that the case provides an

20

21   _____

22           [31] "Under California law, a court has discretion to either sever an unconscionable provision
     from an agreement, or refuse to enforce the agreement in its entirety." *Pokorny v. Quixtar, Inc.*,
23   601 F.3d 987, 1005 (9th Cir. 2010) (citation omitted). When exercising such discretion, "courts
     look to whether the 'central purpose of the contract is tainted with illegality' or 'the illegality is
24   collateral to [its] main purpose.'" *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1180 (9th Cir.
     2003) (citation omitted). Here, the Court determines the impermissible language identified in the
25   Kurzke Agreement does not "taint" the legality of the agreement as a whole. This is consistent
     with the text of Section 16600 which states, in relevant part, that "every contract by which anyone
26   is restrained from engaging in a lawful profession . . . is *to that extent void*." Cal. Civ. Code §
     16600 (emphasis supplied).
27

28

United States District Court
Northern District of California

example of an instance where, "after a bench trial," a district court found a "former employee liable for breaching agreements requiring him to keep his former employer's information confidential and barring his use [of such information] for purposes unrelated to his employment." 2021 WL 5822608, at *2-*3 (S.D. Cal. Dec. 8, 2021).The suggestion that *SolarCity Corp.* supports plaintiff's theory of enforceability under Section 16600 and breach of contract claim is misleading. There, the court held that a former employee breached his employment agreement *during his employment* at the company by accessing certain business information and sending particular information to his personal email. *Id.* at *3. The notion that an employee can be held accountable for actions taken in contravention of their employment contract during the course of their employment is consistent with this Order. The court in *SolarCity* also found the defendant breached his employment agreement by contacting potential customers during and after his termination. *Id.* Without the full record, the Court cannot determine whether such a finding was warranted.  Notwithstanding that decision, the *SolarCity Corp.* court did not articulate any assessment of the enforceability of the agreement under Section 16600 as to generic "confidential information." The Court declines to extend as far here, as that court did there.

Second, in *WeRide Corp. v. Kun Huang*, another court in this district issued a preliminary injunction after determining that a former employer was likely to succeed on, among others, a breach of contract claim against a former employee for "misappropriating and using [the company's] confidential information outside of the scope of his employment." 379 F.Supp.3d 834, 851 (N.D. Cal. 2019). The former employee was alleged to have copied company confidential information onto a USB device *prior to* the termination of his employment. This case is therefore consistent with this Order.

Third, in *Henry Schein, Inc. v. Cook* the court limited the relief to activities arising during the defendant's employment. *See* 2017 WL 783617, at *6 (N.D. Cal. Mar. 1, 2017). Again, such a limitation is consistent with this Order.

That said, the Court turns next to plaintiff's theory of breach.

### b.  *Parties' Cross-Motions Regarding Plaintiff's Claims*

The parties' cross-motions require the Court to assess: (i) the formation of the Kurzke

Agreement, (ii) CZMI's performance of its obligations thereunder, as well as (iii) Mr. Kurzke's alleged breach. The Court addresses each in turn.

**Execution of the Kurzke Agreement.** The formation of the Kurzke Agreement is not genuinely disputed. (Kurzke's Response to Pl's SSF 2.) All agree that the contract was duly entered into by both Mr. Kurzke and CZMI. Plaintiff's request for summary adjudication on this issue is therefore appropriate, and the Court finds as a matter of law that the Kurzke Agreement was duly executed.

**CZMI's Performance of its Obligations Under the Agreement.** CZMI also requests that the Court find as a matter of law that they performed their obligations under the Kurzke Agreement. Defendants nonetheless purport to dispute this. Mr. Kurzke represents, for instance, that "CZMI initiated but never completed" the exit interview process described at Paragraph 8 of the Kurzke Agreement. (*Id.* 7.) He further contends that a Zeiss employee told him that he would be contacted with instructions regarding the return of Zeiss property but that such follow up never occurred. (*Id.*) On that basis, and because CZMI allegedly "breached" "an implied covenant of good faith and fair dealing," Mr. Kurzke avers that CZMI "breached its obligations." (*Id.*)

Defendants' argument is not particularly well taken. The exit interview provisions in the Kurzke Agreement are plainly *permissive*, not *mandatory*. (*See* Kurzke Agreement ¶ 8 ("[U]pon the Company's request . . . Employee shall certify Employee's compliance with the obligations contained [herein] . . . . Employee also agrees to be available for an exit interview with a designated Company representative prior to Employee's departure from Company.").) Further, the Court provided defendants an opportunity at the hearing to identify what language in the Kurzke Agreement supports their theory of breach by CZMI. They could not do so.

For these reasons, the Court determines CZMI's performance of the Kurzke Agreement is not genuinely in dispute. Plaintiff's request for summary adjudication of this issue is therefore appropriate, and the Court finds as a matter of law that CZMI performed its obligations under the Kurzke Agreement.

**Mr. Kurzke's Alleged Breach.** The Court next considers the two ways that Mr. Kurzke's alleged misuse of the 145 HFA reports could constitute a breach of his CZMI employment

agreement.

*First*, the Court considers whether Mr. Kurzke breached his employment agreement by copying CZMI confidential information onto an external hard drive while still employed by the company.

The undisputed evidence shows that, four days after he accepted Topcon's offer of employment and two days before resigning from CZMI, Mr. Kurzke saved thousands of CZMI files onto an external hard drive. (Kurzke Response to Pl's SSF 19, 20, 24) Parties differ, however, on the import of these actions. Plaintiff suggests saving such files onto an external hard drive "indisputably breached" a provision in the Kurzke Agreement prohibiting Mr. Kurzke from copying Zeiss confidential information.[32] (*See* Kurzke Agreement ¶ 4.) What plaintiff fails to note is that the provision in question prohibits the copying of CZMI material when prior permission from the company has not first been obtained and *except where necessary for the purposes of his employment*. (*See id.* (emphasis supplied).)

Defendant latches onto this language to argue that any such copying of the HFA reports by Mr. Kurzke was routine, conducted in the scope of his employment, and was therefore permissible. Mr. Kurzke avers, for instance, that he received the at-issue external hard drive from a CZMI entity in Europe while working there and that he was instructed to back-up the laptop to

---

[32] The Court takes this opportunity to correct two misunderstandings by plaintiff. First, plaintiff writes, "The [Kurzke Agreement] properly limits the reach of [Mr.] Kurzke's nondisclosure and confidentiality obligations to CZMI's trade secrets by only prohibiting [him] from disclosing or using CZMI's Confidential Information which is defined as 'non-public information of value to [CZMI] that [he] learned in connection with [his] employment with [CZMI] and that would be valuable to a competitor or other third parties.'" Pl's Opp'n at 21:21-25. While this definition may bear some likeness to the definition of a trade secret under federal and California law, it is not accurate to say that *only* trade secret information is "confidential information" within the meaning of the Agreement. Were CZMI to have intended such, they could have drafted the agreement differently.

Second, plaintiff mistakenly refers to "electronic data information" and "confidential information" as separate categories of information under the Kurzke Agreement. This is not accurate. The plain text of the agreement states that "electronic data information" is only relevant to the Agreement insofar as it contains Zeiss confidential information. Kurzke Agreement ¶ 4. The Court's analysis in this Order therefore addresses the misuse of Zeiss "confidential information," as that phrase is defined in the agreement, rather than "electronic data information."

1    the hard drive due to his frequent work travel. He further asserts that he did so regularly. (*See* Dkt.

2    No. 591-20, Decl. of S. Carlson in Support of Defs' Motion for Summary Judgment, Ex. 16,

3    Transcript of Kurzke Deposition ("Kurzke Deposition Transcript") at 99:16-101:17.)

4         The Court determines a genuine issue of material fact exists as to the purpose(s) for which

5    Mr. Kurzke saved CZMI files from his work computer onto an external hard drive prior to the end

6    of his employment with Zeiss, and therefore whether he breached his employment agreement by

7    doing so. The related question of whether the HFA reports saved onto Mr. Kurzke's hard drive

8    constitute Zeiss "confidential information" subject to the Kurzke Agreement is also for the jury to

9    consider. As discussed, *supra*, a genuine issue of material fact exists as to the reasonable measures

10   Zeiss may or may have taken to safeguard the secrecy of such reports, which bears not only on

11   whether the collection of reports constitute a trade secret but also the extent to which they were

12   considered "non-public" and therefore "confidential information" under the agreement.

13        *Second*, the Court considers whether Mr. Kurzke breached his employment agreement by

14   using or disclosing Zeiss trade secret information after he left CZMI's employ.

15        It is undisputed that Mr. Kurzke shared the 145 HFA reports comprising Trade Secret No.

16   1 with a third-party software developer, Calcey Technologies, LLC, on July 30, 2018. (Kurzke

17   Response to Pl's SSF 35.) Defendant contends this is of no matter because the collection of reports

18   was not kept secret by Zeiss and therefore the collection is not "confidential information"

19   protected by the Kurzke Agreement.

20        Since the Court denied defendants' motion for summary judgment as to Trade Secret No.

21   1, finding that a triable issue exists as to the confidentiality of the collection of 145 HFA reports,

22   the Court must similarly refuse to enter summary judgment in defendants' favor here. The Court

23   determines a genuine issue of material fact exists as to whether the collection of HFA reports

24   claimed as Trade Secret No. 1 is in fact actionable as a trade secret and relatedly, whether Mr.

25   Kurzke can be said to have breached his CZMI employment agreement by sharing those reports

26   after his employment with Zeiss ended.

27        For the foregoing reasons, the Court **GRANTS** plaintiff's motion for summary adjudication

28   as to both (i) the formation of the Kurzke Agreement, and (ii) CZMI's performance of its

United States District Court
Northern District of California

obligations thereunder. The Court **DENIES** plaintiff's motion for summary adjudication on the issue of Mr. Kurzke's alleged breach of the agreement and similarly **DENIES** defendants' motion for summary judgment as to the plaintiff's breach of contract claim against Mr. Kurzke.

## IV.   CONCLUSION

For the foregoing reasons, the Court makes the following rulings:

(1) Defendants' motion to exclude the expert testimony of Mr. Lewis is **DENIED**.

(2) Plaintiff's motion to exclude the expert testimony of Dr. Kadron is **GRANTED IN PART** as to paragraphs 39-40, 43-44, 47-50, 55, the first sentence of paragraph 56, and 61. The motion is **DENIED IN PART** as to his other opinions.

(3) Defendants' motion for summary judgment is **GRANTED IN PART** as to plaintiff's misappropriation claim relative to Trade Secret No. 64 and **DENIED IN PART** as to plaintiff's remaining claims.

(4) Plaintiff's motion for summary adjudication is **GRANTED IN PART** as to two issues: (i) the execution of Mr. Kurzke's employment agreement with CZMI; and (ii) CZMI's performance of their obligations thereunder. The motion is **DENIED IN PART** as to whether Mr. Kurzke breached his employment agreement, as is defendant's cross-motion on that topic.

This terminates Docket Numbers 577, 591, 594, 597, 600, and 601.

**IT IS SO ORDERED.**

Dated:  September 20, 2023

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**